Gale TUSTIN, Ismael Soto, Milton Ruiz, et al., Plaintiffs,

v.

Margaret HECKLER, Secretary of Health and Human Services, Defendant.

Civ. A. No. 84–2452.

United States District Court, D. New Jersey.

July 12, 1984.

Newman, Herman, Saltman, Levitt & Feinson, P.A. by Kevin Kovacs, David A. Saltman, East Windsor, N.J., for plaintiffs.

W. Hunt Dumont, U.S. Atty. by Bette E. Uhrmacher, Irene Dowdy, Asst. U.S. Attys., Trenton, N.J., for defendant.

## OPINION

BARRY, District Judge.

The legal principles applicable to this case are easily stated and applied. On other levels, however, the case is difficult. In recent years, the Social Security Administration has had its share of problems, many of which have been the product of an earlier time and others which are the result of the profusion of social security claims filed and thereafter adjudicated both at the administrative level and in the courts. Determined and genuine efforts are now being undertaken to restore the agency to full compliance with its mandate of efficient and effective yet compassionate management of social welfare programs.

Indeed, the very ruling by the Secretary of the Department of Health and Human Services which is the subject of this case, which temporarily restored disability benefits to a large class of persons, indicates that identifiable efforts are being made to implement that mandate. This court does not believe it appropriate to intrude into agency affairs, and is reluctant to do so. Nonetheless, this court has an independent obligation to assure itself that the efforts being made are in full compliance with constitutional principles. There is not compliance here.

\* \* \*

This is an action for declaratory and injunctive relief in which the named plaintiffs, Gale Tustin, Milton Ruiz and Ismael Soto, have brought on motions for certification of a nationwide class and for a mandatory preliminary injunction that would, in effect, temporarily restore terminated Social Security disability benefits to those persons who have appeals of terminations pending before United States courts. The defendant, Margaret Heckler, Secretary of the United States Department of Health and Human Services ("the Secretary") has suspended the Social Security Administration's periodic continuing disability review procedures and restored disability benefits to certain classes of persons whose benefits were terminated but who have not yet exhausted their administrative appeals, pending the anticipated passage of amendments to the Social Security Act, 42 U.S.C. § 402 *et seq.* ("the Act"), and the promulgation of concomitant regulations. The Secretary has declined to restore such benefits to persons who have exhausted their administrative appeals and have timely filed actions in District Courts seeking restora-

tion of benefits, and plaintiffs complain on equal protection grounds. For the reasons stated below, the court will grant the preliminary injunction and will certify a nationwide class.

I

The Secretary is required by Section 221(i) of the Act to review every three years the continuing entitlement to disability benefits under Title II and to supplemental social security income benefits under Title XVI of the Act of all beneficiaries, except those determined to have a permanent impairment.[1]

These periodic reviews have been controversial, principally because of the standard of review that has been employed by the Secretary. From 1954 until 1976, the Secretaries of Health, Education and Welfare would not find that disability had stopped unless medical evidence showed that a benefits recipient's condition had improved since it was last determined that he or she had a disability. In 1976, the then-Secretary adopted a policy of finding that disability had stopped if it were found, based on new evidence, that the person was not disabled, as defined in law. In other words, the then-Secretary's position in determining that a disability had ceased became akin to an initial finding of no disability. *Kuzmin v. Schweiker,* 714 F.2d 1233,

1236 & n. 1 (3rd Cir.1983). This policy came to be known as the "current disability standard," and was the policy being applied at the time defendant Secretary promulgated the ruling at issue here.

A number of courts have held that the "current disability standard" is an improper standard for determining when a disability ceases. *See, for example, DeLeon v. Secretary of Health and Human Services,* 734 F.2d 930 (2d Cir.1984) (Secretary's "not currently disabled" standard not authorized by Act or regulations; "medical improvement" standard of finding that recipient's condition has improved to point that he is no longer disabled or that initial finding of disability was erroneous is proper); *Kuzmin v. Schweiker, supra* (in termination proceeding, once claimant has introduced evidence that her condition remains essentially the same as it was at the time of earlier determination, claimant has benefit of presumption that her condition remains disabling; Secretary then has burden of going forward with evidence of medical improvement to rebut presumption); *Dotson v. Schweiker,* 719 F.2d 80 (4th Cir.1983) (initial determination of disability by Secretary gives rise to presumption at time of second hearing that claimant still disabled and Secretary required to come forth with evidence to rebut such presumption).[2]

---

**1.** Section 221(i) of the Act states in pertinent part:

(1) In any case where an individual is or has been determined to be under a disability, the case shall be reviewed by the applicable State agency or the Secretary (as may be appropriate), for purposes of continuing eligibility, at least once every 3 years, subject to paragraph (2); except where a finding has been made that such disability is permanent, such reviews shall be made at such times as the Secretary determines to be appropriate. Reviews of cases under the preceding sentence shall be in addition to, and shall not be considered as a substitute for, any other reviews which are required or provided for under or in the administration of this subchapter.

(2) The requirement of paragraph (1) that cases be reviewed at least every 3 years shall not apply to the extent that the Secretary determines, on a State-by-State basis, that such requirement should be waived to insure that only

the appropriate number of such cases are reviewed...

**2.** *See also Simpson v. Schweiker,* 691 F.2d 966 (11th Cir.1982) (once evidence has been presented which supports finding that given condition exists, which either qualifies or disqualifies claimant for benefits, it is presumed, in absence of proof to contrary, that condition has remained unchanged); *Patti v. Schweiker,* 669 F.2d 582 (9th Cir.1982) (initial determination that claimant was disabled gives rise to presumption at time of later hearing that claimant still disabled and Secretary required to rebut presumption with evidence that claimant's condition had improved in interim); *Miranda v. Secretary of Health, Education & Welf.,* 514 F.2d 996 (1st Cir.1975) (once having found that claimant is disabled, Secretary may not terminate benefits without substantial evidence to justify so doing, evidence normally showing that claimant's condition has improved to point of being able to engage in substantial activity or

While these cases contain subtle distinctions, all are variations on a theme, *i.e.* that to terminate disability benefits, the Secretary had to compare the claimant's condition at the time of review with the condition that existed at the time benefits were awarded and could not merely consider "current medical evidence" concerning the claimant.

Congress took note of the conflict between the courts and the Secretary and both the House of Representatives and the Senate have passed bills which incorporate the "medical improvement" standard. The House passed the Social Security Disability Benefits Reform Act of 1984, H.R. 3755 on March 27, 1984. The Senate passed the Social Security Disability Amendments of 1984, S. 476, on May 14, 1984. The two bills have been referred to a conference committee, which presumably will attempt to reconcile differences when Congress reconvenes several weeks hence.

The Secretary was, of course, well-aware of the adverse court decisions in termination cases and of the progress of H.R. 3755 and S. 476. On April 13, 1984, she announced a temporary suspension of the periodic continuing disability review process under both Title II and Title XVI of the Act and the continuation of benefits to all those affected by the suspension. On May 22, 1984, the Acting Commissioner of Social Security issued a ruling entitled "Titles II and XVI: Temporary Suspension of the Present Periodic Continuing Disability Review Process." The announced purpose of this ruling as stated in the ruling was

> To implement the Secretary's policy concerning a temporary suspension of continuing disability reviews pursuant to section 221(i) of the Social Security Act (the Act), the continuation or restoration of benefits, as appropriate, to those who have not received an Appeals Council decision or notice denying a request to have the Appeals Council review the administrative law judge decision on their periodic review claim *and* who have such claims properly pending in the Depart-

ment and to those who, as of the effective date of this policy, have received an agency determination under section 221(i) which can still be appealed to the next administrative review level.

The ruling went on to state that, in addition to suspending its reviews, the Social Security Administration would rescind determinations of disability cessation for medical reasons of individuals who had not received a ruling from the highest administrative review decisional body, the Appeals Council, or a notice denying a request for review by the Appeals Council of a decision made by an administrative law judge ("ALJ") on periodic review claims and who have such claims pending at the administrative level.

The ruling went on to further state that those who still had time, as of April 13, 1984, to appeal to the next administrative review level the determination to stop their benefits would also have those determinations rescinded and benefits continued. The explanation, as contained in the ruling, was that:

> Such individuals have not had the opportunity to pursue their periodic review claims through all administrative review levels. The absence of such an opportunity and of a final agency decision by the Appeals Council, coupled with the highly unusual circumstances surrounding the periodic review process, make the continuation or restoration of such benefits particularly justified. The policy in this Ruling is consistent with the Secretary's objective of administering the periodic review process in the humane and fair way that the Department and the Congress intended.

The Acting Commissioner's ruling reiterated the distinction between classes of cases affected or not affected by the Secretary's policy of restoring retroactively terminated benefits and stated the justification for that distinction:

> ... (N)o new continuing reviews will be instituted; reviews of cases pending ad-

that claimant's condition not as serious as first

supposed).

ministratively, i.e. those at the reconsideration, hearing and Appeals Council levels and those in the 60-day period for requesting appeal to any of these levels will be suspended and benefits will be continued or restored retroactively, as appropriate, to those who have not received an Appeals Council decision or notice denying a request to have the Appeals Council review the administrative law judge decision *and* who have claims properly pending at any of these stages. Individuals who received an Appeals Council decision or notice denying review and those whose claims were not properly pending administratively (i.e. the time limitations, exhaustion and other administrative appeal requirements have not been satisfied) as of the effective date of this policy will not be continued in or restored to benefit status pursuant to this Ruling. This is because the decisions in their cases have become final administrative determinations since they either did not exercise their right to appeal, they did not appeal timely, or they exhausted all appropriate administrative appeals. Similarly, cases pending in the Federal courts for review of a final agency decision or where the individual did not timely exhaust administrative remedies are not subject to the Secretary's policy even if a court has remanded the case for further administrative action. In such instances, an individual has either pursued his periodic review claim through all steps of the administrative appeals process or had such an opportunity but failed to exercise his administrative appeal rights properly or timely.

The same policy of restoring benefits to those who had not exhausted administrative remedies but denying restoration of benefits to those who had exhausted and now have cases before a Federal court was to apply to class members in currently-pending class-action lawsuits, including those involving the periodic review process.

The Acting Commissioner emphasized that the Secretary's policy of temporarily restoring benefits would apply only to cases being reviewed pursuant to § 221(i)

of the Act and not to those cases which are reviewed pursuant to a scheduled medical reexamination, the so-called "medical diary" cases. The ruling stated that

The impairments of people scheduled for a continuing disability review pursuant to a reexamination diary are different from those selected for periodic review. Medical reexamination diary cases involve people who have impairments from which SSA expects them to recover in a short time, and who were told to expect the review as of a specified month. The medical reexamination process has been in place since the beginning of the program and has not been controversial. Not looking at the claims of people who are fully expected to recover would be shirking SSA's stewardship responsibility. One of the factors that led Congress to require periodic review was its concern that SSA did not always process medical reexamination diary cases timely. This left some people on the rolls who did not meet the definition of disability. SSA believes it is appropriate to continue to process medical reexamination diaries for that group of beneficiaries who were scheduled for review when they were placed on the disability rolls to determine if expected medical recovery did occur. SSA will exercise great care to ensure that only people properly scheduled for medical reexamination are reviewed.

## II

In a declaration dated June 21, 1984, plaintiff Tustin states that she is a resident of subsidized housing in New Brunswick, New Jersey and applied for and was granted disability and SSI benefits effective June 2, 1972. She was notified in 1982 that her entitlement to these benefits would cease in November, 1982. She challenged the termination and continued to receive benefits of $320 per month until April, 1984. Her disability benefits then stopped entirely, but she received $21.40 in SSI benefits in May. She no longer has the medical coverage available to disability re-

cipients and states that she is still unable to work, is without any source of income, and has had to borrow from friends in May and June to meet her rent and grocery expenses. She also asserts that she has no money to meet her daily expenses. Plaintiff Tustin's benefits were terminated as the result of a periodic review and her individual appeal from the Secretary's decision is pending before a court of this District.

In a declaration dated June 20, 1984, plaintiff Ruiz states that he is a resident of Perth Amboy, New Jersey and applied for and was granted disability benefits effective September 2, 1977. He was notified in January, 1983 that he was no longer entitled to disability benefits, contested that determination, and continued to receive benefits until January, 1984. He is still under the treatment of two New Brunswick physicians, but since the termination of his disability benefits has had no medical coverage. Ruiz adds that he is still unable to work and is "in a bad financial situation" necessitating the borrowing of money. Ruiz's benefits were terminated as the result of a periodic review and his individual appeal from the Secretary's decision is pending before this court.

In a declaration dated June 20, 1984, plaintiff Soto states that he resides with his wife and two minor children in Perth Amboy and applied for and was granted disability benefits effective January 29, 1979. He was notified in 1980 that his benefits would cease and they, in fact, ceased in or about July, 1981. He asserts an inability to return to work and reliance upon his wife's income, which has been reduced by a decrease in her work week to two to three days per week, resulting in a worsening family financial situation. Soto's benefits were terminated as the result of a medical diary reexamination and his individual appeal from the Secretary's decision is pending before a court of this District.

■ The standard in this Circuit for determining whether a preliminary injunction should issue is clear:

A preliminary injunction is not granted as a matter of right. *Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc.*, 630 F.2d 120, 136 (3rd Cir.), *cert. denied*, 449 U.S. 1014 [101 S.Ct. 573, 66 L.Ed.2d 473] (1980). It may be granted, however, if the moving party demonstrates both a reasonable probability of eventual success in the litigation and that the party "will be irreparably injured *pendente lite.*" *Kennecott Corp. v. Smith*, 637 F.2d 181, 187 (3rd Cir. 1980). The trial court may also consider the possibility of harm to other interested persons from the grant or denial of the injunction, as well as harm to the public interest. *Eli Lilly & Co.*, 630 F.2d at 136. The grant or denial of a preliminary injunction is committed to the sound discretion of the trial judge, who must balance all of these factors in making a decision. *Penn Galvanizing Co. v. Lukens Steel Co.*, 468 F.2d 1021, 1023 (3rd Cir.1972).

*Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3rd Cir.1982).

Here, plaintiffs seek a mandatory preliminary injunction. The Third Circuit has recognized that it is appropriate to issue such an injunction "in a case in which the status quo 'is a condition not of rest, but of action' ..." *United States v. Price*, 688 F.2d 204, 212 (3rd Cir.1982) quoting *Toledo, A.A. & N.M. Ry. Co. v. Pennsylvania*, 54 F. 730, 741 (C.C., N.D.Ohio 1893). In a passage in *Toledo*, quoted approvingly in *Price*, the court instructed that

The office of a preliminary injunction is to preserve the status quo until, upon final hearing, the court may grant full relief. Generally this can be accomplished by an injunction prohibitory in form, but it sometimes happens that the status quo is a condition not of rest, but of action, and the condition of rest is exactly what will inflict the irreparable injury upon complainant... In such a case courts of equity issue mandatory writs before the case is heard on its merits.

■ The same balancing test that is used in considering whether a prohibitory injunction shall issue is used when it is a mandatory injunction that is being considered. *Id.* As one scholarly commentator put it

Emphasis on preserving the status quo is a habit without a reason. To freeze the existing situation may inflict irreparable injury on a plaintiff deprived of his rights or a defendant denied the right to innovate. The status quo shibboleth cannot be justified as a way to limit interlocutory judicial meddling, because a court interferes just as much when it orders the status quo preserved as when it changes it. The test is not even easy to apply, since it eddies off into conundrums about what status is decisive.

Aversion to mandatory injunctions, like the solicitude for the status quo from which it grew, has continued to make judicial opinions. Although judges should consider how seriously an injunction restricts the defendant's lawful freedom of action, the restriction cannot be measured by whether the injunction compels or forbids action. The distinction between requiring action and prohibiting action is mainly a verbal one unrelated to the likelihood of irreparable loss to the defendant.

Leubsdorf, *The Standard for Preliminary Injunctions,* 91 Harvard Law Review 525, 546 (footnotes omitted).

■ Moreover, the fact that an injunction may require the payment or expenditure of money does not necessarily foreclose the possibility of equitable relief. *United States v. Price, supra* at 212–213; *U.S.W.A. v. Fort Pitt Steel Casting,* 598 F.2d 1273, 1280 (3rd Cir.1979). Accordingly, the court may consider here the four factors traditionally considered by courts of equity in determining whether preliminary injunctive relief should be made available. *See A.O. Smith Corp. v. F.T.C.,* 530 F.2d 515, 525 (3rd Cir.1976).

Plaintiffs argue that they will suffer irreparable harm because they have been financially dependent on disability payments for long periods and the termination of these benefits has severely impaired their ability to provide themselves with basic needs such as housing, food and health care. They are, they argue, unable to perform any substantial gainful employment and are without another sufficient source of income. Defendant retorts that it is well-established that "the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 952, 39 L.Ed.2d 166 (1974). She quotes from *Oburn v. Shapp,* 521 F.2d 142, 151 (3rd Cir.1975) for the proposition that:

Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

Plaintiffs respond that they are on a very different footing than the plaintiff in *Sampson,* an unlawful discharge case. While the *Sampson* plaintiff had been earning a livelihood up to the time of discharge and continued to be employable, plaintiffs argue that they "are not only without any income due to the cutoff of benefits, but because of their continued disability, they are without any means of procuring the necessities of life." Plaintiffs' Reply Brief at 7.[3]

Professor Leubsdorf's writings are illuminating on the question of whether there can ever be irreparable injury where the party seeking injunctive relief could, at some point, be compensated with money:

The concept of irreparable injury takes on different meanings in different contexts. At trial, it refers to injury for which there is no adequate remedy at

---

**3.** Additionally, plaintiffs argue that they will be irreparably harmed if their cases are decided under existing statutes and regulations, rather than "the progressive amendments Congress is now contemplating." *Id.* at 8.

law. At the interlocutory hearing, it denotes injury for which there is no adequate remedy—legal or equitable—at final judgment. Even in the first context, the conclusion that an injury is irreparable involves considerations of policy apart from the feasibility of computing damages. Today, factors including the need for a jury trial, the relative burdens of damages and injunctions, and the substantive law's concern with changing conduct or compensating victims help to shape the remedial choice. If necessary, any injury can be stated in money terms. The courts have often enjoined illegal strikes on the theory that they cause irreparable injury, but when Congress created a damage action for strikes in breach of contract, it proved possible to estimate damages.

A finding of irreparable injury in the preliminary injunction context is still farther removed from any equation of irreparability with quantifiability. Injury may be ascertainable but still irreparable, as when the law immunizes a state officer against liability for acts committed before they were clearly unconstitutional. On the other hand, injury may be unascertainable but nevertheless reparable when final injunctive relief can remove it. To decide whether a final remedy is good enough to warrant forgoing an immediate injunction calls for thinking, not just counting.

91 Harvard L.Rev. at 551–552.

The example of anti-strike injunctions, despite a readily available money damage remedy, exemplifies a broader principle, to wit: "A future injury of uncertain date and incalculable magnitude is irreparable harm, and protection from such an injury is a legitimate end of injunctive relief." *Phillips v. Crown Central Pet. Corp.*, 602 F.2d 616, 630 (4th Cir.1979). *See also Celotex Corp., Pittston P., Harding Pa. v. Oil, C. & A.W., etc.*, 516 F.2d 242 (3d Cir.1975).

The same principle has been applied by a number of district courts. For example, in *Albert Price, Inc. v. Metzner*, 574 F.Supp. 281 (E.D.Pa.1983), a copyright infringe-

ment case, plaintiff held the certificate of registration for a wood duck card box, while defendants marketed a strikingly similar box. Plaintiff was awarded a preliminary injunction barring defendants from selling their version of the box. The court stated, at 289, that

> ... Price has shown that it will be irreparably harmed if an injunction is not entered. This irreparable harm would result from the serious, long-lasting, and incalculable harm to Price's competitive position vis-a-vis the defendants if the defendants were allowed to continue marketing their infringing duck card boxes.

It should be noted that in *Phillips* and *Price*, the courts were not merely exercising the long familiar equitable intervention to prevent a multiplicity of suits, see *Jerome v. Ross*, 7 John.Ch.R. 315 (1823), 2 Story, *Commentaries on Equity Jurisprudence as Administered in England and America* §§ 930–933 (1843); rather, the courts were concerned for the very survival of the corporate persons. *See also Lee v. Winston*, 551 F.Supp. 247 (E.D.Va.1982) (irreparable harm to plaintiff's dignity if state allowed to remove bullet from his body); *Hall v. University of Minnesota*, 530 F.Supp. 104 (D.Minn.1982) (irreparable harm to student's plans to be professional basketball player in defendant's refusal to admit him to degree program).

It has been said by Professor Zachariah Chafee that equity is "a set of effective and flexible remedies admirably adapted to the needs of a complex society." Quoted in Re, *Cases and Materials on Remedies* xxii (1982). It is well established that "Flexibility rather than rigidity has distinguished [equity]. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs..." *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944). In order for equity to be truly effective, it must always look to the reality of private needs when carrying out the balancing process.

It is readily apparent to this court that plaintiffs face a "future injury of uncertain date and incalculable magnitude" if their terminated benefits are not restored. Plaintiffs are not seeking the proverbial pot of gold but merely restoration of the minimal disability benefits they received until recently, benefits which made their lives tolerable. To plaintiffs, whose impecuniouness is aggravated by an inability—actual or merely perceived—to return to the job market, the loss of even the relatively small amount of money that they were receiving has further extended their marginality. Not only can one expect that, when plaintiffs no longer have recourse to borrowed funds, they will face the loss of housing and the ability to maintain proper nutritional standards, but they also will be unable to access continuing medical care through the social security system.

Assuredly, if irreparable harm inheres in the risk created by an infringer to a corporation's ability to continue to market its wooden duck boxes, or the risk that prisoner's dignity will be offended by the removal of a bullet, or the risk to a potential sports professional in not being admitted to college, irreparable harm also inheres in this case. There is a clear likelihood that, without the relief sought, a realistic danger exists that the plaintiffs seeking relief will be without the means to avail themselves of the basic needs of food, shelter, or medical care, much less the means to be self-sustaining. I "do not think that it is necessary for [plaintiffs] to show that without an injunction 'rigor mortis [would] set in forthwith.'" *Rockwell Intern. Systems, Inc. v. Citibank, N.A.*, 719 F.2d 583, 586 (2d Cir.1983) (quoting *Studebaker Corp. v. Gittlin*, 360 F.2d 692, 698 (2d Cir.1966)). Thus, irreparable harm will accrue to plaintiffs if injunctive relief is withheld.

Plaintiffs argue that they have a strong likelihood of success on the merits because the governmental classification here penalizes the exercise of a basic liberty, reasonable access to the courts. Such a penalty, if shown, would, of course, require this court's strict scrutiny of the government's attempt to show that the classification is necessary to promote a compelling governmental interest. *See Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). In their Reply Brief, however, plaintiffs acknowledge that the ruling in question here does not specifically impede access to the courts, as did the Illinois law that required criminal defendants to pay a fee in order for their cases to be reviewed by an appellate court and that was held to be unconstitutional in *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1966). Rather, plaintiffs argue that they are being penalized for taking their cases to the District Court.

While the distinction made by the Secretary between persons who have and those who have not exhausted their administrative appeals may have the effect of denying benefits to those who have elected to press their claims in the federal courts, I cannot conclude that plaintiffs have demonstrated that the government was motivated, in promulgating its ruling, by a desire to deny a valuable government benefit to them because they have exercised a fundamental right. *See, generally, Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Judicial inquiry into government motivation is appropriate in instances of discretionary governmental action. *See* Ely, *Legislative and Administrative Motivation in Constitutional Law*, 79 Yale L.J. 1205, 1269 (1970). Because plaintiffs do not constitute a protected class and have not shown that their exercise of a right of access to the courts was the cause of the government's distinction, the court will not engage in strict scrutiny of the government's action. *See Schweiker v. Wilson*, 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981).

However, the challenged ruling may still be tested to determine whether it classifies the persons it affects in a manner rationally related to legitimate governmental objectives. *Mathews v. DeCastro*, 429 U.S. 181, 185, 97 S.Ct. 431, 50 L.Ed.2d 389

(1976).[4] This "rational relation" test is not a toothless standard. *Mathews v. Lucas*, 427 U.S. 495, 510, 96 S.Ct. 2755, 2764, 49 L.Ed.2d 651 (1975). As has been perceptively observed, the right to equal protection of the law requires " 'some rationality in the nature of the class singled out,' with 'rationality' tested by the classification's ability to serve the purposes intended by the legislative or administrative rule: 'The courts must reach and determine the question whether the classifications drawn in a statute are reasonable in light of its purpose...'" Tribe, *American Constitutional Law* (1978) at 995, quoting *Rinaldi v. Yeager*, 384 U.S. 305, 308–309, 86 S.Ct. 1497, 1499, 16 L.Ed.2d 577 (1966) and *McLaughlin v. Florida*, 379 U.S. 184, 191, 85 S.Ct. 283, 287, 13 L.Ed.2d 222 (1964).

The Secretary contends that the classification here has a rational basis and, because it is equitable and administratively manageable, serves a legitimate governmental interest in finding administratively efficient means for regulating social welfare programs. *See Weinberger v. Salfi*, *supra* 422 U.S. at 781, 95 S.Ct. at 2474 (nine-month duration-of-relationship requirement for one to be considered "widow" or "child" in order to obtain Social Security benefits designed to prevent "sham marriages" not denial of equal protection). The distinction that the Secretary defends here is between those claimants and beneficiaries who have not yet had a judicially reviewable "final decision" of the Secretary and those who have already received such a decision and have exercised their right to judicial review under 42 U.S.C. § 405(g). The latter category, according to the government, see Brief at 11, "will have a judicial determination of their claims in relatively short order," and the fact of "final decision" at the administra-

tive level is the sole rationale offered for the differing treatment.

The question that must be answered in the negative for plaintiffs to demonstrate a reasonable probability of success on the merits is this: does the exclusion of plaintiffs from defendant's policy of temporarily restoring terminated benefits bear a rational relationship to the Secretary's interest in restoring benefits to those who have not yet had a final decision rendered on their claim to benefits.

Separate and apart from the critical fact that the "final decision" plaintiffs received was under a standard no longer being applied, this question, at least theoretically, would have to be answered in the affirmative. Reality, however, has widely diverged from theory in the application of the Social Security disability benefits law and regulations.

Information supplied to this court by an official of the Social Security Administration indicates that during fiscal 1983, district courts rendered 5,986 "Final Court Decisions", that is, decisions that affirm or reverse a "final decision" of the Secretary or that dismiss a case. Of these "Final Court Decisions", 5717 or 95 percent were "Disability Final Court Decisions." The breakdown of these disability decisions is as follows:

| Program | Aff'd | Rev'd | Dis'd | Total |
|---|---|---|---|---|
| Title II | 2362 | 1225 | 221 | 3808 |
| Title XVI | 369 | 137 | 40 | 546 |
| Concurrent (Titles II & XVI) | 968 | 318 | 77 | 1363 |
| Total | 3699 | 1680 | 338 | 5717 |

Dept. Health & Human Services "Summary of Civil Litigation" (Fiscal Yr. 1983)

In addition to these dispositions, the nation's district courts also remanded 5,198

---

**4.** "A statutory classification in the area of social welfare is consistent with the Equal Protection Clause of the Fourteenth Amendment if it is 'rationally based and free from invidious discrimination.' *Dandridge v. Williams*, 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491. While the present case, involving as it does a federal statute, does not directly implicate the Fourteenth Amendment's Equal Protection Clause, a classification that meets the test articulated in *Dandridge* is perforce consistent with the due process requirement of the Fifth Amendment. Cf. *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884." *Richardson v. Belcher*, 404 U.S. 78, 81, 92 S.Ct. 254, 257, 30 L.Ed.2d 231 (1971), quoted in *Weinberger v. Salfi*, 422 U.S. 749, 770, 95 S.Ct. 2457, 2469, 45 L.Ed.2d 522 (1975).

cases to the Secretary. If one assumes that because 95 percent of all Social Security cases disposed of by the district courts were disability cases, 95 percent of the remanded cases also involved disability, then 4,938 disability cases were remanded during fiscal 1983. If one then adds these remanded cases (4,938) to the total number of disability cases that were reversed (1,680) and divides that total (6,618) by the number of cases that were affirmed, reversed or remanded (10,317) [5], the result is that over 65 percent of disability cases were reversed or remanded by the district courts.

However, some of the Secretary's victories at the district court level are transient. Because "even after the apparently rigorous district court screening, the courts of appeals reverse district court judgments in favor of the Secretary approximately one quarter of the time," *Wier v. Heckler,* 734 F.2d 955, 957 (3rd Cir.1984) (citation omitted), 124 of the 494 disability cases decided by courts of appeals in the relevant time period must be subtracted from defendant's total of victories in the federal courts, raising the percentage of remands and reversals to over 66 percent. *See 1983 Annual Report of the Director of the Administrative Office of the United States Courts* 224 (Table B–1A). This figure accords with the Third Circuit's determination that in the Eastern District of Pennsylvania, during a two and one-half year period, "Approximately 45 percent of the cases [were] remanded to the Secretary for further proceedings. The claimant wins outright or subject to further proceedings in 22 percent of the cases initially filed," *Wier v. Heckler, supra,* and with Judge Sarokin's finding in *Merli v. Heckler,* No. 83–189 at 1 (D.N.J. June 7, 1984) that "In the six months ending in December, 1983, of the appeals taken to this United States District Court from such denials [of disability benefits], 56 percent were reversed or remanded."

With regard to the high rate of reversal and remand, Judge Becker commented that

... the system of adjudication created by Congress for resolving eligibility for disability benefits is not working as it should. Depending on one's perspective, either the judicial system is placing impossible burdens on the administrative apparatus set in place by Congress to initially evaluate benefit claims or the officials in charge of the disability programs are, at least in many instances, ignoring the law. At all events, the resulting frictions and the inefficiencies are burdening all concerned.

*Wier v. Heckler, supra* 734 F.2d at 956.

The cause of this high rate of reversal and remand does not bear on the present motion, but the fact of that rate certainly does have consequences for the Secretary's argument that she has refused to restore benefits to those disability claimants who have cases before the district court because such persons have availed themselves of the administrative process and have had the opportunity to receive a "final decision" of the Secretary. Cf. *Califano v. Yamasaki,* 442 U.S. 682, 697, 99 S.Ct. 2545, 2555, 61 L.Ed.2d 176 (1979) (high reversal rate in cases where Secretary orders recoupment mandates imposed hearing requirement). That about two-thirds of disability cases reaching the district courts are either reversed or remanded means that in no sense are the Secretary's decisions to terminate "final."

Vast numbers of persons are challenging administrative determinations by the Secretary. The largest increase in any category

---

5. The 338 cases that were dismissed by the district courts cannot readily be considered victories or defeats for the Secretary at the district court level. Many, perhaps the bulk, of dismissals occur when the Secretary decides to voluntarily remand a case for further administrative review and action, at times because of new evidence and at times because of a realization that a mistake was made during the administrative process. Occasionally, a plaintiff decides to dismiss or the court determines that it lacks jurisdiction because a plaintiff has not exhausted administrative appeals. Because the court cannot subclassify the dismissals category, such cases are not considered in determining how often defendant prevails in the federal courts in disability cases.

of civil filings in the district courts in the twelve month period ended December 31, 1983 was comprised of Social Security disability filings. Such cases rose from 10,109 in 1982 to 22,168 in 1983. *See* Administrative Office of the United States Courts, Statistical Analysis and Reports Division, *Federal Judicial Workload Statistics* (1984) at 11. According to this court's calculations, about two out of three of those who file can expect to be successful in obtaining a reversal or a remand, although often after a wait of many months or years.

The Secretary does not maintain separate statistics for termination cases, but a sample of such cases decided in this District during the period February-May, 1984, reveals that 83% of termination cases were either reversed or remanded. Given that the claimants in termination cases have often been disabled for many years and given the refusal of the Secretary to employ a medical improvements standard, it is hardly surprising that the remand and reversal rate in termination cases is even higher than with respect to disability cases as a whole. This extraordinarily high rate of reversal by federal courts of termination cases comes, it might be added, on top of a national 61 percent rate of reversal of initial termination decisions by ALJ's. *See Holden v. Heckler,* 584 F.Supp. 463 (N.D. Ohio 1984), citing 130 Cong.Rec. H1956–93.

If the determinations of the Secretary in disability cases in general and in termination cases in particular are not final because most persons who come to federal court seeking a remand or reversal of the Secretary's denial of benefits have their demands met, then the proffered rationale for the distinction in the disputed ruling between those who have or have not obtained such a "final" decision is chimerical. The government is, in effect, discriminating among claimants to funds from the public treasury on the basis of a criterion which bears no rational relationship to a legitimate legislative goal.

The governmental interest in equitably and efficiently managing the disability pro-gram is not at all served by a distinction which grants temporary benefits to persons who have not heard the Secretary's last word on their claims to benefits but denies restoration to a group of claimants who have heard that word, but who will predictably end up proving that that last word was erroneous. The effect of this distinction is to require those persons to endure what will ultimately be determined in an extraordinary percentage of cases they should not have had to endure. Such a distinction is not only inequitable; it is also inefficient. It is hardly cost-effective for a multitude of attorneys to defend decisions, most of which will be reversed or remanded and, if the latter, perhaps remanded to be considered under a new standard that is radically different from that employed by the Secretary at the time of termination.

In this connection, it must be stressed that the Secretary has *de facto* abandoned the standards which were previously employed, and has done so because of conflicting court decisions and "imminent" legislation (Def.Br. at 3), legislation which would affect plaintiffs to the same extent as it would affect those persons still within the administrative review process. There is, therefore, no reason to treat plaintiffs differently now and no reason, given that the adjudicative process at the agency level has been brought to a halt, for courts to be burdened with making determinations the Secretary has determined not to make. Moreover, it is neither fair nor logical that the Appeals Council decision which preceded plaintiffs' filings in district court should be given weight when no other decision within the administrative review process is any longer given any weight.

Further, the court has ascertained that consent judgments were entered on May 15, 1984 in *Stephenson v. Heckler,* No. 84–CIR–2902 (WCC) (S.D.N.Y.) and *Frazier v. Heckler,* No. 84–CIR–2694 (VLB) (S.D.N. Y.). In those cases, the government consented to the restoration of benefits to persons in the same position as plaintiffs here. No "legitimate objective" of the

government barred entry of those orders.[6] *See also McDaniel v. Heckler*, No. 83–2714 (W.D.Pa. May 22, 1984) in which Judge Mencer remanded plaintiff's case relying not on the Secretary's policy change which, in any event, prohibited remand, but primarily on "justice, achieved in this context by fair and humane treatment of the disabled" in the "climate as altered by the policy change." (Mem. on Reconsideration, June 8, 1984).

The refusal to restore temporary benefits to persons who have cases before the federal courts on the same basis as the restoration to those whose termination cases are still at an administrative appeals level has no rational basis related to the government's announced objective and does not rationally relate to any legitimate objective that this court can imagine. Plaintiffs have therefore established a reasonable likelihood of success on the merits.

The Secretary also argues—presumably in connection with the "harm to other parties" and "public interest" prongs of the test for determining whether a preliminary injunction should issue—that she would be greatly burdened in having to determine which of the claims pending in federal courts involve termination of benefits. The Secretary has, of course, made this determination with reference to the named plaintiffs herein, and this argument is pressed most forcefully with reference to class certification. In any event, it is the Secretary's responsibility to classify her own records so as to allow for accessibility. Mere inconvenience to a defendant is scarcely a reason for not providing otherwise warranted equitable relief. *See Bishop Clarkson Memorial Hospital v. Reserve Life Ins. Co.*, 350 F.2d 1006, 1012 (8th Cir.1965).

Plaintiffs are entitled to an injunction commanding that defendant restore benefits to those who have cases in the federal courts in the same manner in which benefits were restored to those with cases still at the administrative level. Such an injunction shall issue.

### III

The Secretary makes several arguments in opposition to plaintiffs' motion for class certification[7], one of which I readily ac-

---

**6.** By letter dated July 9, 1984, counsel for defendant observed that these orders were entered before the Acting Commissioner's written ruling was issued. The orders, however, were entered after the Secretary's announcement of the suspension of the review process and the continuation of benefits.

**7.** Plaintiffs assert jurisdiction under 28 U.S.C. § 1331; 28 U.S.C. § 1346(a)(2); 28 U.S.C. § 2201; 28 U.S.C. § 2202; 42 U.S.C. § .405(g); 28 U.S.C. § 1361 and the Due Process Clause of the Fifth Amendment. While it is clear that no federal question jurisdiction exists as to actions to recover any claim under Title II of the Act, *Weinberger v. Salfi, supra* 422 U.S. at 757, 95 S.Ct. at 2462, jurisdiction under 42 U.S.C. § 405(g) exists only as to the named plaintiffs of any class created, except where the unnamed plaintiffs can be shown to have exhausted their administrative appeals. *Id.* at 763, 95 S.Ct. at 2465; *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1979). Here, the class could only consist of those who have exhausted. In any event, the Third Circuit has held that where the Secretary has taken a final position on a statutory issue, exhaustion by unnamed class members is not necessary. *Liberty Alliance of the Blind v. Califano*, 568 F.2d 333, 343–346 (3rd Cir.1977). *Liberty Alliance* is not inconsistent with *Yamasaki. Paskel v. Heckler*, 99 F.R.D. 80, 83 (E.D.Pa.1983). *See also McDaniels v. Heckler*, 571 F.Supp. 880, 883 (M.D.Pa. 1983) (exhaustion requirement may be waived by Secretary, e.g. by acquiescence to court's exercise of jurisdiction, or by court finding that Secretary has made a final decision). Here, the court has jurisdiction under § 405(g) as to all of those cases in which a final decision of the Secretary was made after a hearing, there was commencement of a civil action within 60 days after the mailing of notice of such decision (or within such further time as the Secretary may allow), and there was the filing of the action in an appropriate district court, in general that of the plaintiff's residence or principal place of business. *Weinberger v. Salfi, supra* 422 U.S. at 763–764, 95 S.Ct. at 2465–66. A court may also obtain mandamus jurisdiction over all members of a class whose members seek relief relating to social security claims. *See Califano v. Yamasaki, supra* 442 U.S. at 700, 99 S.Ct. at 2557; *Mercer v. Birchman*, 700 F.2d 828 (2d Cir.1983); *Mattern v. Weinberger*, 519 F.2d 150 (3rd Cir. 1975), *vacated on other grounds*, 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812 (1976); *Ellender v. Schweiker*, 550 F.Supp. 1348, 1356–57 (S.D.N.Y. 1982) (collecting cases). The Secretary has not challenged this court's jurisdiction.

cept. The Secretary correctly points out that the Acting Commissioner's ruling does not restore benefits to those persons whose benefits were terminated as the result of a medical diary reexamination and, therefore, any claim of a denial of equal protection based upon a differentiation of those persons whose cases are still in the administrative process from those persons with cases pending in federal court is unavailing.

■ Under the Acting Commissioner's ruling, terminations will continue to be made as to those who are scheduled for medical diary reexaminations, whenever appropriate. Those persons whose benefits were terminated as the result of the same procedure and who have filed actions in federal court will thus not be heard to complain that they have been denied equal protection because they have not had benefits temporarily restored, since those with "medical diary" cases at the administrative level are equally bereft of temporary benefits under the Secretary's policy. "Medical diary" claimants must rely on the merits of their individual cases in order to retain or have restored benefits. No relief then can be granted to plaintiff Soto in this action and medical diary claimants cannot be considered part of any class that is certified.

■ The Secretary also argues that because each member of the proposed class already has an individual action pending in a district court, certification of a class is unwarranted. The same argument was made and rejected by the Supreme Court in *Califano v. Yamasaki, supra* 442 U.S. at 701–703, 99 S.Ct. at 2557–2558. There, the Secretary had determined that a number of benefits recipients had been overpaid for previous years and sought recoupment. Some of these recipients sought administrative relief and, when unable to halt recoupment, brought suit in the United States District Court for the Western District of Washington, alleging that the recoupment

procedures of the Secretary violated both the Due Process Clause of the Fifth Amendment and a provision of the Act. They sought certification of a nationwide class, an injunction ordering repayment of amounts unlawfully withheld, and other relief.

The district court certified a nationwide class but excluded from that class residents of Hawaii and the Eastern District of Pennsylvania, where class action suits raising similar issues were known to have been brought.[8] As a precautionary measure, the district court also excluded all persons who had participated as plaintiffs or as members of a plaintiff class in litigation against the Secretary on similar issues, if a decision on the merits previously had been rendered. 442 U.S. at 688–689, 99 S.Ct. at 2551.

Secretary Califano argued that a nationwide class was

unwise in that it forecloses reasoned consideration of the same issues by other federal courts and artificially increases the pressure on the docket of this Court by endowing with national importance issues that, if adjudicated in a narrower context, might not require our immediate attention. Moreover, the Secretary, citing *Dayton Board of Education v. Brinkman*, 433 U.S. 406 [97 S.Ct. 2766, 53 L.Ed.2d 851] (1977), as an example, argues that nationwide class relief is inconsistent with the rule that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.

*Id.* at 701–702, 99 S.Ct. at 2557–2558.

The Court stated that Fed.Rule Civ.P. 23 does not limit the geographical scope of class actions that otherwise conform to the Rule, adding:

Nor is a nationwide class inconsistent with principles of equity jurisprudence, since the scope of injunctive relief is dic-

---

8. The Hawaii class action resulted in *Elliot v. Weinberger,* 564 F.2d 1219 (9th Cir.1977); the Eastern District of Pennsylvania class action resulted in *Mattern v. Weinberger, supra. See* 442 U.S. at 687 n. 3, 689, 99 S.Ct. at 2550 n. 3,

2551. Here, it has been represented to the court that no other class actions have been filed which raise the same claim as the case *sub judice.*

tated by the extent of the violation established, not by the geographical extent of the plaintiff class. *Dayton Board,* 433 U.S. at 414–420 [97 S.Ct. at 2772–2775]. If a class action is otherwise proper, and if jurisdiction lies over the claims of the members of the class, the fact that the class is nationwide in scope does not necessarily mean that the relief afforded the plaintiffs will be more burdensome than necessary to redress the complaining parties.

We concede the force of the Secretary's contentions that nationwide class actions may have a detrimental effect by foreclosing adjudication by a number of different courts and judges, and of increasing, in certain cases, the pressures on this Court's docket. It often will be preferable to allow several courts to pass on a given class claim in order to gain the benefit of adjudication by different courts in different factual contexts. For this reason, a federal court, when asked to certify a nationwide class, should take care to ensure that nationwide relief is indeed appropriate in the case before it, and that certification of such a class would not improperly interfere with the litigation of similar issues in other judicial districts. But we decline to adopt the position that such a class may never be certified. The certification of a nationwide class, like most issues arising under Rule 23, is committed in the first instance to the discretion of the district court.

*Id.* at 702–703, 99 S.Ct. at 2558.

While it certainly is within a district court's discretion to conclude that classwide consideration of like cases in one district might interfere with the litigation of similar issues in other judicial districts, *see Geraghty v. United States Parole Comm.,* 719 F.2d 1199, 1205 (3rd Cir.1983), several courts since *Yamasaki* have certified nationwide or regionwide classes in actions against the United States.

In *United States v. Will,* 449 U.S. 200, 209, 101 S.Ct. 471, 477, 66 L.Ed.2d 392 (1980), thirteen United States District Judges filed an action in the District Court for the Northern District of Illinois challenging the validity of certain statutes relating to the salaries of all federal judges and were certified as representatives of the nationwide class of federal judges.

In *Mayburg v. Heckler,* 574 F.Supp. 922 (D.Mass.1983), a Medicare recipient brought an action seeking class certification of all persons residing in Region One of the Department of Health and Human Services who, having presented claims for medicare Part A benefits, had been or would be denied such benefits based on the determination that they had a single "spell of illness" which continued while they resided in a skilled nursing facility even though they were receiving custodial, rather than skilled, nursing care. There was a similar case pending before the Second Circuit and the Secretary argued that the final ruling in the Massachusetts case might conflict with the final ruling in the Second Circuit case because certain of the states in HHS Region 1 are within the jurisdiction of the Second Circuit. The District Court commented that "There is no reason to limit geographic scope of the plaintiff class to individuals living in Massachusetts. The Supreme Court has emphasized that nothing in Rule 23 limits the geographic scope of an otherwise proper class action ... The pendency of a similar lawsuit in another federal court does not preclude this court from certifying a region-wide class." *Id.* at 928 (citation omitted).

In *Coleman v. Block,* 100 F.R.D. 705 (D.N.D.1983), a class action was brought challenging the practices of the Farmers Home Administration with respect to the prehearing cutoff of necessary family living and farm operating expenses after a decision to accelerate or liquidate had been made, appeals procedures, and the manner in which deferral relief provisions were to be implemented. The plaintiffs moved to file an amended complaint that would expand the scope of the class from a statewide class to a national class, excluding only those states in which state-wide class actions motions were pending or classes

had been certified. Determining that the violations of statutory or constitutional rights that were alleged by the North Dakota class action were based on regulations and practices that were national in scope, *Id.* at 706, the court concluded that expansion of the class nation-wide was appropriate.

In *McClure v. Harris*, 503 F.Supp. 409 (N.D.Cal.1980), *rev'd on other grounds*, 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982), suit was brought challenging the constitutionality of hearing procedures available under Part B of the medicare program covering "supplementary" medical costs. With regard to plaintiff's motion for class certification, the court stated that it found such certification not only permissible but desirable. Although similar cases were then pending in at least three other district courts and a similar case in a fourth district had already been decided, the court maintained that

A class action is the most efficient and expeditious means of reaching a final and binding resolution of the constitutional questions surrounding the Part B Medicare program. The class action device is particularly well suited to this situation, where the maintenance of countless individual actions might produce inconsistent demands upon defendants and inequitable results for similarly-situated plaintiffs. Although plaintiffs here would exclude from their proposed class all persons who are plaintiffs in the pending cases listed above, class certification would preclude any further proliferation of such lawsuits.

From this analysis flows the logical conclusion that the class should be nationwide in geographical scope. The statute and hearing procedures under attack apply to all Part B beneficiaries across the country. The anti-proliferation aspect of class certification can be meaningfully realized only if the class is nationwide.

*Id.* at 413.

All of these courts were applying the principle set out in *Califano v. Yamasaki*, *supra* 442 U.S. at 701, 99 S.Ct. at 2557, that a nationwide class action is appropriate whenever

The issues involved are common to the class as a whole. They turn on questions of law applicable in the same manner to each member of the class ... It is unlikely that differences in the factual background of each individual claim will affect the outcome of the legal issue. And the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every social security beneficiary to be litigated in an economical fashion under Rule 23.

 Here, the issue involved is common to all persons whose benefits were terminated as the result of periodic review and who now have cases properly before a federal court. The question of law is the same in each case. There are no factual differences among those persons that were terminated for reasons having to do with the evaluation of their medical condition that will affect whether such persons are entitled to relief. The nationwide class action device will certainly save the resources of courts and the parties who might individually seek comparable relief. Any class certified here should be a nationwide class.

 The Secretary is concerned that plaintiffs have not sharply defined the class. The court is not troubled in this regard. It is not the plaintiffs who certify themselves as a class, but the court that defines and certifies a class. When the complaint in this action was being framed, plaintiffs admittedly did not have a copy of the ruling that they now challenge and could not know of its failure to accord temporarily restored benefits to medical diary cases. The court has had the benefit of the ruling and is able to define the class to include only those persons whose benefits were terminated as the result of periodic review and whose cases are now pending in federal court.

The Secretary's primary concern is as to her ability to ascertain who is in the class. She cites *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir.1982), for the proposition

that "It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." She states that she would find it "exceedingly burdensome" and "especially burdensome" to ascertain who the class members might be because she does not keep computerized records that would readily identify the cases now pending in the courts.

In a declaration dated July 5, 1984, the Assistant United States Attorney assigned to the case states that she has been "informed" that the Secretary maintains "a monthly manual (noncomputerized) count of the *number* of disability cases pending judicial review [but that] [t]hese records are not maintained by case name." She also states that 48,398 disability cases are now pending in the courts, but that the Secretary has no breakdown of the disability cases that would distinguish termination cases from initial application cases [9] and that a manual review of each administrative record in each case would be required, not only to weed out the termination cases from the non-termination cases, but also to separate periodic review cases from medical diary cases. She further notes that the United States Attorney for the District of New Jersey has a computerized system which identifies the number of its cases pending in federal court against the Social Security Administration and that these numbered 855 on May 29, 1984.

Preliminarily, I should note that the A.U.S.A.'s declaration is on information and belief and there has been no affidavit evincing first-hand knowledge that a determination as to who could receive restored benefits would present an intractable problem for the Secretary. There is no explanation as to how the Secretary has managed to restore benefits to those whose benefits were terminated and who still have their cases pending at an administrative appeals level. While plaintiffs should not, in any event, have to bear the burden of the Secretary's lack of automated record keeping

and the apparent lack of knowledge of what types of cases are even pending, the court suggests that she could quickly ascertain precisely which individuals are class members by sending telegrams to the 94 United States Attorneys, many of whose offices are computerized, and whose personnel presumably have a detailed familiarity with the Social Security cases that they are assigned to defend.

■ The Secretary also suggests that plaintiffs have failed to satisfy the numerosity requirement of Fed.R.Civ.P. 23(a)(1) which requires that the party seeking certification of a class show that its proposed members are "so numerous that joinder ... is impracticable." She admits that there are "a great many disability termination cases now pending in the District Courts across the country ...", Defendant's brief at 10, but maintains that plaintiffs are required to establish numerosity. This argument is patently frivolous in light of the Secretary's admission that "a great many" termination cases are before the courts. If the *La Bonne* court's percentage is correct, 19,360 termination cases were pending before the courts in 1983 and, presumably, more are pending now. A class of several thousand satisfies all requirements of numerosity, *Mader v. Armel*, 402 F.2d 158 (6th Cir.1968), *cert. denied*, 394 U.S. 930, 89 S.Ct. 1188, 22 L.Ed.2d 459 (1969); 7 Wright & Miller, *Federal Practice and Procedure* § 1762. Plaintiffs have obviously met the numerosity requirement of 23(a)(1).

The Secretary's argument as to the commonality and typicality requirements of Fed.R.Civ.P. 23(a)(2) and (3) is not consequential in light of the court's delineation of the class to exclude medical diary cases and cases which involved termination for reasons having nothing to do with the evaluation of a medical condition. The requirements of commonality and typicality, however, tend to merge with the adequacy of representation requirement of 23(a)(4). *See General Telephone Co. of the South-*

---

**9.** In 1983, 40 percent of the disability cases pending in the courts were termination cases.

*La Bonne v. Heckler,* 574 F.Supp. 1016, 1018 (D.Minn.1983).

*west v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

In this connection, the Secretary argues that plaintiffs cannot adequately represent any class, thus failing to meet the standard of Fed.R.Civ.P. 23(a)(4) because she projects potential antagonisms among class members. She notes that plaintiffs seek not only temporary restoration of benefits, but also remand of their cases for adjudication of their claims under whatever new standard results from amendment of the Act and the promulgation of concomitant regulations. She imagines that proposed class members would be of different minds as to whether their cases should be adjudicated by her under the Secretary's standard, under various of the cases that announced a medical improvements standard, or under some new standard. Moreover, she avers that there may be potential class members who would want immediate district court action in order to obtain an outright dismissal rather than await the outcome of a remand.

The Secretary's conjectures about divergent interests among potential class members are not logically supportable. Above all, those who have lost benefits are interested in nothing more and nothing less than the restoration of those benefits. While different subsets among those whose benefits were terminated may have varying conceptions of the best strategy or the best standard to be utilized to again become disability beneficiaries, it is difficult to imagine any among them who would not want now what they may only hope to achieve later. There is little chance that there would be potential class members who would abjure receiving temporarily restored benefits out of confidence that they will obtain a reversal from a district court at some later date. It is, in any case, a mistaken view which holds that all members of a plaintiff class must have identical interests:

> To some extent, however, terms such as identity, coextensiveness, and coincidence may imply too strict a standard. Identity certainly goes too far; as does coincidence, which is nearly synonymous with identity ... 'Shared interests,' on the other hand, does not go far enough, because it fails to account for a plaintiff who shares some interests with the class but nevertheless has conflicts with class members ... Adequate representation demands more. 'Compatible interests' comes nearer the mark, because it does not mean identical, or even nearly identical. It means capable of existing together without serious conflict. Though a standard of compatibility might be helpful, lack of conflict remains the most direct approach.

1 Newberg, *Class Actions* § 1120b at 197.

Whether one views the proposed class from the viewpoint of the Secretary's postulated conflicts or from the viewpoint of compatability, plaintiffs Tustin and Ruiz are capable of providing adequate representation [10] since they, like all other persons with cases before federal courts whose benefits were terminated as the result of periodic review, are interested in restoration of benefits and it is unnecessary that named plaintiffs' desire to have their cases litigated under a new standard be identical to the desire of every class member. Even those individuals who would want to hazard a court decision before the promulgation of regulations can hardly be expected to object to receiving benefits *pendente lite* but, if objection was made, that individual could be permitted to press his or her individual case.

This court views the divergent interest concern as insubstantial and will administratively terminate all of the periodic review termination cases before it pending

---

**10.** The Secretary does not challenge the adequacy of plaintiffs' representation by counsel. Since counsel has been successful in obtaining relief for those who were denied equal protection by the Acting Commissioner's ruling, the court must also conclude that plaintiffs' counsel meets the standard of F.R.C.P. 23(a)(4). It is likely that counsel's most extensive involvement will prove to have been its role in obtaining class certification and the preliminary injunction.

enactment of an Act with an amended standard and the issuance of appropriate regulations. It will be left to Congress to determine whether the new standard should be applied to cases now before the court. If the legislation makes the new standard retroactive, courts within the Third Circuit will not apply *Kuzmin* nor will courts within other circuits apply any standard but the one prescribed by Congress.

The court views this approach as more equitable than requiring the standard applied to each individual case to be a function of how quickly a court acts to dispose of that case. Because it is unlikely that segments of the class plaintiffs will represent have interests conflicting with those that plaintiffs have sought to advance and because the interests of the class have been competently urged in the motions before the court, the test of Rule 23(a)(4) has been met. *See Sosna v. Iowa*, 419 U.S. 393, 403 n. 13, 95 S.Ct. 553, 559 n. 13, 42 L.Ed.2d 532 (1975).

█ In certifying a class, it is necessary to choose between the three types of class action specified in Fed.R.Civ.P. 23(b). Rule 23(b)(1) permits a class action where necessary to avoid possible adverse effects on either the opponents of the class or on absent class members. Rule 23(b)(2) permits a class action where the party opposing the class has acted or has refused to act on grounds generally applicable to the class. An action under this rule is expressly limited to cases in which "final injunctive relief or corresponding declaratory relief with respect to the class as a whole" would be appropriate and, thus, excludes actions for damages. However, if the predominant purpose of the suit is for injunctive relief, an incidental award of damages or back

pay is permissible. *Holmes v. Continental Can. Co.*, 706 F.2d 1144, 1152 (11th Cir. 1983); *Paxton v. Union Nat. Bank*, 688 F.2d 552, 563 (8th Cir.1982), *cert. denied* 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983); *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 251 (3rd Cir. 1975); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 256–258 (5th Cir. 1974).

█ Rule 23(b)(3) authorizes a class action where the only justification for such a procedure is the presence of common questions of law or fact. Under the rule, a court must make a finding in this respect and also find that a class action is superior to other methods for fairly and efficiently adjudicating the matter. While I do not doubt that the four factors that a court is to consider, among others,[11] in determining whether a class action is superior would indicate that a (b)(3) action is possible here, it is well-established that, if feasible, an action should be maintained under (b)(1) or (b)(2) rather than under (b)(3), *see* 3B *Moore's Federal Practice* § 23.31(3) at 23–262 (1983), because (b)(3) classes are thought of as heterogenous in composition. *See Wetzel v. Liberty Mutual Insurance Co., supra* at 249. As was made clear in considering Rule 23(a)(4), I regard the class here as being quite homogenous and the party opposing the class has certainly acted or refused to act on grounds generally applicable to the class, making final injunctive relief appropriate. I also note that in a recent year-long period, numerous reported class actions under 23(b)(2), most of which involved failure to apply a medical improvements standard, have been brought against the Secretary.[12]

---

**11.** As listed in Rule 23(b)(3), these factors are "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

**12.** *See Holden v. Heckler, supra; Polaski v. Heckler,* 585 F.Supp. 997 (D.Minn.1984); *Avery v. Heckler,* 584 F.Supp. 312 (D.Mass.1984); *Johnson v. Heckler,* 100 F.R.D. 70 (N.D.Ill.1983); *Hyatt v. Heckler,* 579 F.Supp. 985 (D.N.C.1984); *Doe v. Heckler,* 576 F.Supp. 463 (D.Md.1983); *Johnson v. Heckler,* 100 F.R.D. 70 (N.D.Ill.1983); *Graham v. Heckler,* 573 F.Supp. 1573 (N.D.W. Va.1983); *Mayburg v. Heckler, supra; Faught v. Heckler,* 577 F.Supp. 1180 (S.D.Iowa 1983); *Paskel v. Heckler,* 99 F.R.D. 80 (E.D.Pa.1983);

Rule 23(c)(3) [13] contemplates that because of the cohesive nature of the class, members of a (b)(2) class will all be bound by the judgment in the action. Any resulting unfairness to class members was thought by the Advisory Committee that framed Rule 23 to be outweighed by the purposes behind class actions. *Wetzel v. Liberty Mutual Insurance Co., supra.* In *Wetzel,* defendant had argued that since both (b)(2) and (b)(3) requirements had been met, the court should certify the class under (b)(3) to provide the procedural protections of notice and opting out which (b)(3) affords to class members.

The Third Circuit determined that the procedural protections of (b)(3) are necessary because of the heterogeneity of a (b)(3) class, but unnecessary for a homogenous (b)(2) class, noting that the Supreme Court, in *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), had refused to extend the (b)(3) notice requirement to (b)(2) actions. *See also* Note, *Notice in Rule 23(b)(2) Class Actions,* 128 Pennsylvania L.Rev. 1236, 1253 (1980). The *Wetzel* court concluded that where an action is maintainable under (b)(2) and (b)(3), it should be treated under (b)(2) in order to enjoy the superior *res judicata* effect and to eliminate the procedural complications of (b)(3). 508 F.2d at 252–53. It

went on to hold that, although an unnoticed class member could be bound in a (b)(2) action, due process did not require a prejudgment opportunity to opt out. *Id.* at 256–57.

The Third Circuit has also held that there is no reason to allow class members to have a greater opportunity to opt out of a class action after a classwide liability determination than before:

> Indeed, in many respects sound policy suggests that individual class members should be less free to opt out of a class action following a classwide liability determination against a defendant than before. If, following an interlocutory determination of classwide liability, a defendant could not be assured of a judgment disposing both of prospective injunctive and declaratory relief and of retrospective individual relief, the incentive to dispose of the entire matter by a negotiated settlement will be substantially reduced.

*Kyriazi v. Western Elec. Co.,* 647 F.2d 388, 394–395 (3rd Cir.1981).

■■■ Accordingly, the class here will be certified under Rule 23(b)(2) with no notice to class members and no opportunity to opt out. The policies which favor discretionary notice under F.R.C.P. 23(d)(2),[14] *i.e.* notification of class members of their right to

---

*Lugo v. Heckler,* 98 F.R.D. 709 (E.D.Pa.1983); *Kelly on Behalf of Lofstock v. Perales,* 566 F.Supp. 785 (S.D.N.Y.1983); *Lopez v. Heckler,* 572 F.Supp. 26 (C.D.Cal.1983), *aff'd in part and rev'd in part on other grounds,* 725 F.2d 1489 (1984).

**13.** Fed.R.Civ.P. 23(c)(2) and (3) read:

(2) In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel.

(3) The judgment in an action maintained as a class action under subdivision (b)(1) or (b)(2), whether or not favorable to the class, shall in-

clude and describe those whom the court finds to be members of the class. The judgment in an action maintained as a class action under subdivision (b)(3), whether or not favorable to the class, shall include and specify or describe those to whom the notice provided in subdivision (c)(2) was directed, and who have not requested exclusion, and whom the court finds to be members of the class.

**14.** Rule 23(d)(2) states that:

"In the conduct of actions to which this rule applies, the court may make appropriate orders: ... (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action."

intervene and solicitation of useful information from unnamed class plaintiffs, *see* Note, *Notice in Rule 23(b)(2) Class Actions, supra* at 1257–58, are not persuasive here. There seems to be little that can be contributed legally or factually by a notified member and factors such as the financial burden of notice on the representative parties and the necessity for quick action are overwhelmingly against notice.

The Secretary is directed to advise the court, within ten days of the date of the order to be entered herein: 1) the number of persons who are members of the class as defined, and 2) the method by which and the time within which the Secretary proposes to implement this court's ruling of retroactive restoration of terminated disability benefits to the class as defined. If this information is, for whatever reason, not provided to the court within that ten day period of time, the court will seriously consider appointing a Special Master. *See* Fed.R.Civ.P. 53.