67 N.J. Super. 83 (1961)
169 A.2d 845
HERBERT B. CRANE, ET AL., PLAINTIFFS,
v.
BOROUGH OF ESSEX FELLS, A MUNICIPAL CORPORATION, ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided April 11, 1961.
*84 Mr. Edward R. McGlynn for plaintiff (Messrs. McGlynn, Stein & McGlynn, attorneys; Mr. Roger H. McGlynn, on the brief).
Mr. Ernest F. Keer, Jr., for defendant Borough of Essex Fells (Messrs. Boyd, Dodd, Keer & Booth, attorneys; Mr. John A. Booth, on the brief).
*85 MINTZ, J.S.C.
This is an action to enjoin defendant Borough of Essex Fells (herein referred to as the "borough") from conducting a 72-hour pumping test of a water well that it has drilled on lands of the Essex County Park Commission in the Borough of West Caldwell. Plaintiffs own property in the vicinity of the well and obtain their water supply from their own private wells. By stipulation the action as against the Essex County Park Commission was dismissed with prejudice and without costs. Initially, the matter came before the court on plaintiffs' motion for interlocutory injunction and defendant's motion for summary judgment. The parties stipulated that final judgment be entered upon the conclusion of oral argument.
The borough owns and operates a water supply system which furnishes water to the borough and five neighboring Essex County municipalities, one of which is the Borough of West Caldwell. Since 1954 Essex Fells has recognized the need for additional water sources, due to the demands being placed on the system by the rapid building and population expansion in the municipalities served, particularly in the Borough of West Caldwell. Initially defendant attempted to find new water sources near its transmission mains, but the test wells which it drilled failed to develop enough water to justify the expense of permanent pumping and accessory equipment.
Pursuant to the request of the Borough of Essex Fells, the Essex County Park Commission on June 2, 1960 granted permission to drill a test well on its land in West Caldwell. Drilling started June 28, 1960. On July 19, 1960 a pump was installed and tested for about two hours. On July 21 an attempt was made to start a 72-hour test, when one of the plaintiffs notified the borough that no water could be obtained from her well. Affidavits from the other plaintiffs are to the effect that the pumping also diminished their water supplies. It was then decided that the pump should be removed and pumping tests deferred until arrangements could be made with the local well owners and well users to *86 furnish them with a temporary water supply from the public main during the test period. A letter sent to property owners and tenants using wells in the area which could be affected by the test offered a free water supply during the test, to be furnished by a temporary connection with the defendant's water mains. It explained the need for a new source of water, the need for a pumping test, and stressed that the present well was only for test purposes. It pointed out that if a permanent well were to be drilled, "arrangements will be made to take care of the water needs of those affected." The application for a temporary water supply was stated to be without prejudice to any legal rights. The letter further said that the pumping test would be renewed on or about November 7, 1960. Plaintiffs rejected defendant's offer and brought this action.
The affidavit of defendant's engineer asserts:
"It is standard practice to determine the quantity of water that may be anticipated from a new well by means of not less than 72 hours of continuous pumping of a test well. Data relative to such a test together with data to support the need for additional water must be submitted to the Water Policy and Supply Council as part of an application for additional diversion rights."
The Council's approval is a prerequisite to the acquisition of such rights. Monmouth Consolidated Water Co. v. Baris, 66 N.J. Super. 9 (Law Div. 1961); R.S. 58:1-17; N.J.S.A. 13:1A-9; 13:1B-50.
The plaintiffs urge that in New Jersey the principle governing adjoining landowners' rights in percolating waters is the doctrine of "reasonable use," the so-called "American rule." The rule is referred to in Meeker v. City of East Orange, 77 N.J.L. 623, 638-639 (E. & A. 1909), as follows:
"* * * This does not prevent the proper user by any landowner of the percolating waters subjacent to his soil in agriculture, manufacturing, irrigation, or otherwise; nor does it prevent any reasonable development of his land by mining or the like, although the underground water of neighboring proprietors may thus be interfered with or diverted. But it does prevent the withdrawal of underground *87 waters for distribution or sale for uses not connected with any beneficial ownership or enjoyment of the land whence they are taken, if it results therefrom that the owner of adjacent or neighboring land is interfered with in his right to the reasonable user of sub-surface water upon his land, or if his wells, springs or streams are thereby materially diminished in flow, or his land is rendered so arid as to be less valuable for agriculture, pasturage, or other legitimate uses."
Plaintiffs urge that the borough has as its ultimate purpose the transportation of water away from the land for sale to other municipalities, and since it is not even the owner of the land on which the well is located, its proposed use is unreasonable since it will deplete the water supply available to plaintiffs through their wells.
Plaintiffs take the position that the defendant borough could not use the waters which it now seeks to discover by way of testing; that it has no statutory authority to acquire sources of water supply beyond its territorial limits, for the purpose of supplying water to other municipalities; that since the end result is unlawful, this court should not countenance any proposed testing in furtherance of such unlawful use and to their irreparable injury. Hence plaintiffs need not await the outcome of the proposed tests and are entitled to injunctive relief.
We are not here concerned with the rights of a private land owner to divert water from the land. Authorities that have been cited which preclude such diversion are inapplicable. The pertinent statutes, which empower a municipality to acquire lands and water rights as sources of water supply for the municipality and other municipalities serviced by it, are as follows:
R.S. 40:62-49 in part provides:
"Any municipality may provide and supply water, or an additional supply of water, for the public and private uses of such municipality and its inhabitants, in any one or more of the following methods:

* * * * * * * *
b. Any municipality or any two or more municipalities may enter into a contract, for any period not exceeding fifteen years, with *88 any other municipality having waterworks, to obtain from it a supply of water for the public and private use of such first mentioned municipality.

* * * * * * * *
g. Any municipality may purchase, condemn or otherwise acquire the necessary lands, and rights or interests in lands, and water rights and rights of flowage or diversion, within or without the municipality, for the purpose of a water supply, or an additional water supply, and for the connection thereof with the municipality, * * *. Damages for the taking of such property, as well as the value of such property taken, shall be ascertained and paid according to law. * * * The municipality may construct, erect, maintain and operate dams, canals, aqueducts, reservoirs, basins, standpipes, buildings, purification plants, filtration plants, and all necessary pipe lines and other works; and may drill, construct, operate and maintain artesian wells, when in its judgment the same may be needed for the purpose of such water supply; and may provide for the protection of the same from pollution by the construction of sewers, or by other means. * * *" (Emphasis supplied)
Plaintiffs urge that R.S. 40:62-47 expressly limits the right of the municipality "to provide water for the public and private uses of the municipality and its inhabitants," and that there is a like limitation in the opening paragraph of R.S. 40:62-49 heretofore referred to. However, it clearly appears under R.S. 40:62-49 that a municipality may contract with any other municipality having water works to obtain a water supply for the public and private uses of such first mentioned municipality, and under subdivision (g) that a municipality may purchase, condemn or otherwise acquire lands and water rights within or without the municipality for the purpose of a water supply. These statutes are to be read in conjunction with R.S. 40:62-84 which provides that "The governing body of any municipality owning or controlling waterworks may enter into a contract or contracts with any other municipality to furnish a supply of water to it and its inhabitants, for public or private use * * *." Thus, since the municipality has a right to contract to furnish water to another municipality, furnishing such water constitutes either a public or private use for which the furnishing municipality may condemn land and *89 water rights under R.S. 40:62-49(g). Similar provisions in earlier statutes have been construed to mean that a municipality could condemn land and water rights to secure a supply of water, even though the municipality also supplies water to another municipality. Mundy v. Fountain, 76 N.J.L. 701 (E. & A. 1908). Related statutes, which are in pari materia and are to be read in conjunction with R.S. 40:62-47 and 49, are R.S. 40:62-89, R.S. 58:6-1 and N.J.S.A. 40:37-145.
R.S. 40:62-89 provides that a municipality may acquire by purchase or condemnation property within or without the corporate limits of the municipality, necessary for the purpose of furnishing water power to operate pumping stations, pumps and other machinery used in taking and storing water from streams and other sources in this State and "distributing such water for the use of the municipality and of consumers, both within and without the municipality."
R.S. 58:6-1 in part provides:
"Every municipal * * * corporation * * * engaged in the business of supplying water for public use in one or more municipalities of this State, * * * which * * * shall obtain from the state water policy commission * * * [or its successor agency] the approval of plans for and assent of the state to the diversion of water for any new or additional water supply or from any new or additional source or sources of water supply in this state, may acquire by gift, devise, purchase or condemnation all such lands, water and water rights as may be required to enable such municipal * * * corporation, * * * to divert and use water for such new or additional water supply or from such new or additional source or sources of supply in accordance with the plans so approved and the assent of the state so obtained." (Emphasis supplied)
This statute clearly contemplates the use of the water so obtained "in this state" for the supply of "one or more municipalities."
N.J.S.A. 40:37-145 in part provides:
"The county park commission may contract with any county, municipality * * * for the crossing, use and occupancy of any *90 lands owned by * * * the county park commission, for the purpose of constructing * * * water mains and the necessary appurtenances, making of exploratory tests for underground waters, and the sinking, operating and maintenance of wells, and the withdrawal of water therefrom * * *."
The irresistible conclusion to be drawn from all the cited statutes is that a municipality engaged in supplying water to other municipalities and their inhabitants may acquire water rights and sources of water supply beyond its territorial limits. While the end result is lawful, namely, the proposed acquisition of an additional source of water supply, and N.J.S.A. 40:37-145 specifically permits the testing in the stated circumstances, the borough is still subject to the rule of "reasonable use" enunciated in Meeker, supra, where land was acquired for a water plant pursuant to statutory authority. The underground waters may not be withdrawn for the authorized purpose, with immunity, when such withdrawal impairs the neighboring land owners' reasonable user of sub-surface water. Such withdrawal may constitute an actionable wrong. 4 Restatement, Torts, §§ 858-63 (1939). However, we are not here concerned with damage claims nominal or substantial, if any, or such right to equitable relief, that may accrue to plaintiffs as a consequence of the test run. The issue is simply whether under all of the facts and circumstances an appropriate case has been presented for injunctive relief.
There is no showing of irreparable injury. The municipality has offered to supply the property owners who may be affected by the test run with a temporary substitute water supply from the public water main. The borough engineer and water superintendent for the borough states in his affidavit that "No one knows what effect pumping our well will be on adjacent wells until we pump our well. Furthermore, if we chose to abandon it, the hole will be sealed with concrete and the water in the water bearing stratum will return to the former level." From his affidavit  and there is no affidavit to the contrary  it clearly appears that the *91 water in the water bearing stratum will return to its original level, assuming that it may be affected during the test run.
It is appropriate at this point to refer to some of the considerations bearing on the decision not to grant injunctive relief. As is pointed out in 4 Restatement, Torts, § 933 (1939), "The availability of injunction against a committed or threatened tort depends upon the appropriateness of this remedy as determined by a comparative appraisal" of the relevant factors. Section 936 (1) states the primary factors to be considered are:
"(a) the character of the interest to be protected (§ 937),
(b) the relative adequacy to the plaintiff of injunction and of the remedies listed in §§ 944-951 (§ 938),
(c) plaintiff's delay in bringing suit (§ 939),
(d) plaintiff's misconduct (§ 940),
(e) the relative hardship likely to result to defendant if injunction is granted and to plaintiff if it is denied (§ 941),
(f) the interests of third persons and of the public (§ 942), and
(g) the practicability of framing and enforcing the order or judgment (§ 943)."
The significance of the public interest factor is illustrated in Hurley v. Kincaid, 285 U.S. 95, at page 104, 52 S.Ct. 267, at page 269, 76 L.Ed. 637 (1932), where Justice Brandeis said:
"* * * For even if the defendants are acting illegally, under the act, in threatening to proceed without first acquiring flowage rights over the complainant's lands, the illegality, on complainant's own contention, is confined to the failure to compensate him for the taking, and affords no basis for an injunction if such compensation may be procured in an action at law. [Footnote: Even where the remedy at law is less clear and adequate, where large public interests are concerned and the issuance of an injunction may seriously embarrass the accomplishment of important governmental ends, a court of equity acts with caution and only upon clear showing that its intervention is necessary in order to prevent an irreparable injury.] The Fifth Amendment does not entitle him to be paid in advance of the taking."
See also City of Harrisonville v. W.S. Dickey Clay Mfg. Co., 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208 (1933).
*92 In 56 Am. Jur., Waters, § 126, at pp. 607-608, it is said:
"* * * Injunctions involving rights to percolating waters should however be granted only upon the clearest showing that there is imminent danger of irreparable and substantial injury from the diversion or interference complained of. * * * Where the rights of the public are involved in a suit to enjoin the abstraction of subterranean waters for use at a distance, and the court can arrive in terms of money at the loss which local landowners have sustained, an absolute injunction will not be granted but the proceeding will be regarded as one to secure compensation to the local owners for their injury."
And compare Canada v. City of Shawnee, 179 Okl. 53, 64 P.2d 694 (Sup. Ct. 1937) with Koch v. Wick, 87 So.2d 47 (Fla. Sup. Ct. 1956).
Our courts have frequently indicated their hesitancy to enjoin properly authorized public projects on the ground that alternative forms of relief were more appropriate. Cf. Borough of Paramus in Bergen County v. Bergen County, 25 N.J. 492 (1958); Grey ex rel. Simmons v. City of Paterson, 60 N.J. Eq. 385 (E. & A. 1900); Berdan v. Passaic Valley Sewerage Commissioners, 82 N.J. Eq. 235 (Ch. 1913), affirmed, o.b. 83 N.J. Eq. 340 (E. & A. 1914); Doughty v. Board of Commissioners of Somerville, 33 N.J. Eq. 1 (Ch. 1880); Pennsylvania R.R. v. New York & Long Branch R.R., 23 N.J. Eq. 157 (Ch. 1872); Cross v. Mayor, etc. of Morristown, 18 N.J. Eq. 305 (Ch. 1867). But cf. Mayor, etc. of Paterson v. East Jersey Water Co., 74 N.J. Eq. 49 (Ch. 1908), affirmed o.b. 77 N.J. Eq. 588 (E. & A. 1910).
A recent case in point is Township of Hatfield v. Lansdale Municipal Authority, 19 Pa. D. & C.R.2d 281 (C.P. 1959). Defendant condemned certain land and drilled a well upon it for the purposes of supplying a water system operated by it which furnished the Borough of Lansdale and the surrounding area with water. Plaintiffs sought to enjoin the operation of the well, urging, inter alia, that it was unlawful because its operation would impair plaintiffs' private water *93 supply. The court found that the effect of a pumping test was to lower the water level in neighboring wells and render the remaining water cloudy and dirty, and that the contemplated use of defendant's well was unlawful. It was mindful, however, of the municipal function and service performed by the defendant authority and sought to achieve a fair balance between the authority and the aggrieved plaintiffs that would protect their rights and also recognize the need of the authority for a water supply. The court then held that it would permit the authority to operate the well on condition that upon the demand of well users or owners within a 1,600-foot radius of the defendant's well, defendant would install mains, laterals, meters, etc., at its own expense so that the well users need only pay for the water they consume. In the event defendant did not comply with such requests, the operation of the well would be enjoined.
The Supreme Court of Pennsylvania affirmed the ruling of the lower court in an opinion filed March 13, 1961, reported in 168 A.2d 333 (1961). In the course of its opinion the court said:
"* * * there is no absolute right to appropriate percolating waters for an unlawful purpose. Such an unlawful purpose includes the diversion for sale to others away from the land when such conduct impairs the supply of a well on the property of another. Rothrauff v. Sinking Spring Water Company, 339 Pa. 129, 14 A.2d 87 (1940). This is referred to as the doctrine of reasonable user.

* * * * * * * *
The lower court, mindful of the injury incurred on appellees, nevertheless took notice of the `municipal function and service performed by the Authority' and made the permanent injunction conditional upon appellant Authority's joining to its system without cost all interested injured parties within a radius of 1,600 feet. That court, relying on Restatement, Torts, §§ 858-864 (1939), held that a court of equity in cases involving subterranean water rights could balance the needs of a total community affected by a permanent injunction against the property rights of the appellees. * * * The determination of the lower court was well within the broad powers of a court of equity and will not be disturbed by our court."
*94 There is an urgent water problem in this area and municipalities engaged in the business of supplying water need to provide adequate sources of water supply for an expanding population and industrial expansion. Certainly the public interest would be adversely affected, and the effectiveness of statutes empowering municipalities to obtain such additional sources of water supply seriously curtailed by the invocation of the injunctive process sought in this case.
The court will balance the needs of the borough and the municipalities serviced by it against the property rights of the plaintiffs. The borough may run a 72-hour test on the well it has drilled on property of the Essex County Park Commission on the west side of Passaic Avenue in the Borough of West Caldwell; provided that at least seven days prior to such pumping test, defendant will renotify all property owners and tenants in the area of the proposed test, and renew its willingness to furnish, and actually furnish without charge, adequate potable water from the public water supply to serve the needs of the respective property owners and tenants whose private water supply may be affected during such test pumping.
A form of judgment consistent with the views herein expressed will be submitted, consented to as to form or to be settled on notice.