294 N.J. Super. 437 (1996)
683 A.2d 611
SAMARITAN CENTER, INC. AND TRACY STATION ASSOCIATES, PLAINTIFFS,
v.
THE BOROUGH OF ENGLISHTOWN, THE TOWNSHIP OF MANALAPAN AND THE WESTERN MONMOUTH UTILITIES AUTHORITY, DEFENDANTS.
Superior Court of New Jersey, Law Division Monmouth County.
Decided July 12, 1996.
*440 Christopher J. Hanlon for plaintiff (Gross, Hanlon & Truss, attorneys).
Mitchell J. Ansell for defendant Borough of Englishtown (Ansell, Zaro, Grimm & Aaron, attorneys).
Robert F. Munoz for defendant Township of Manalapan (Lomurro, Davison, Eastman & Munoz, attorneys).
James J. Cleary and Douglas S. Crawford for defendant Western Monmouth Utilities Authority (Cleary, Alfieri & Grasso, attorneys).
HAYSER, J.T.C., temporarily assigned.
Does a municipality have any obligation to facilitate, if not assist, the development of low and moderate income housing in a neighboring municipality? In the final analysis, that is the issue presented in this matter.[1] It is essentially a legal issue, but there *441 are factual aspects that must also be addressed in reaching a conclusion in a given case.
Plaintiff Samaritan Center, Inc. (Samaritan) is a non-profit corporation organized to provide, among other things, housing for low income and other needy persons in western Monmouth County. Plaintiff Tracy Station Associates (Tracy Station) is the owner of certain real property and possesses, as a successor in interest, certain development approvals that include, arising from a final Mount Laurel Consent Order, a component to enable the construction of low and moderate income housing, whether voluntary or not. Southern Burlington Cty. N.A.A.C.P. v. Mount Laurel Tp., 92 N.J. 158, 279, 456 A.2d 390 (1983). (Mount Laurel II).
Both plaintiffs have their projects located in the defendant Township of Manalapan (Township). The Township is apparently cooperating with these projects, at least to the extent of meeting its constitutional obligation under Mount Laurel II as determined in the Mount Laurel housing component of the earlier Consent Order, wherein, effectively, a 20% set aside for low and moderate income housing construction was required of Tracy Station's predecessors.
In addition, the Township is donating certain public lands to Samaritan for the purpose of constructing residential housing for a project to be denoted as "New Beginnings." The project will involve the construction of single family homes, with sixty-seven units restricted for low and moderate income needs. There will also be twenty other units constructed with limited time constraints on resale. Final site plan approval for this project is pending before the Township's Planning Board. Tracy Station's project consists of 140 approved townhouses, 20% of which, or twenty-eight units, are reserved for low and moderate income housing under the previously required set aside.
Plaintiffs have entered into an agreement to share the costs of providing required water and sewer services to their sites, which are in close proximity to each other. The issue that has given rise *442 to this litigation concerns the provision of such utility services for plaintiffs' projects.
Water service is to be provided by the Gordons Corner Water Company (Gordons Corner), a private water company operating under its franchise within the jurisdictional limits of the Township. Connection to the projects' water supplier could be accomplished by either of two alternatives.
The first alternative is to connect the project through an existing back-up line owned and operated by the defendant Borough of Englishtown (Englishtown). The Englishtown line, in turn, is connected to a water line of Gordons Corner, a distance of approximately 800 feet from the Tracy Station property.[2]
The second alternative is to connect to the Gordons Corner water line directly from the Tracy Station property, a distance of approximately 4,500 feet. This required, however, the successful negotiation of various access easements and the future construction of a pump station to bypass the sewer connections of defendant Western Monmouth Utilities Authority (WMUA), which construction is apparently not acceptable to the utilities authority. Apparently, the need for the pump station arose while easements were being acquired, due to changes in the Matchaponix Pond which the line must cross.
Other alternatives will still involve the need, at least, to construct an approximately 4,500 foot connection line, but, in fact, the combined distance for both projects to the nearest direct water connection would be approximately 5,400 feet. Both the Township *443 and Gordons Corner have conceptually approved the provision of water service, subject, of course, to the necessary connection to a water supply being provided.
Sewer service is to be provided by the WMUA, which has also granted conceptual approval for same. Connection for sewer service can, also, be provided by either of two alternatives.
The first alternative is to connect the project to an Englishtown sewer line located approximately 1,700 feet from the Tracy Station property. This sewer line, in turn, connects to WMUA lines for ultimate treatment at its regional facility.
The second alternative is to connect directly to WMUA line some 6,200 feet from the Tracy Station property. This option, however, requires the acquisition of necessary access easements and the construction of the pump station, previously disapproved by the utilities authority.
Other alternatives, if any, would require the construction of, at least, a 6,200 foot connection line.
Plaintiffs' engineer has estimated the cost savings, if permitted to construct water and sewer lines connected to Englishtown's lines, the shortest distances, will be $412,888. This has not been disputed. However, plaintiffs point out that they are faced with a more significant problem than the need to simply control expenses for the housing projects. Construction for the Samaritan project is dependent upon a variety of public and private sources for its funding, including a community block grant from the United States Department of Housing and Urban Development (HUD), which will expire in May, 1997, if not expended. This grant alone represents $260,000 of the total public financing of $2,300,000 that has been raised for this $10,000,000 project. Another governmental grant of $334,000 will also expire at that time. Grants were sought in accordance with the budgetary requirements of the project. Therefore, the remaining time, it is argued, is critical, especially if alternative easements must be obtained or a pump *444 station constructed, over WMUA disapproval, under the non-Englishtown alternatives.
Englishtown was contacted by plaintiffs, requesting the desired connections, but those requests were denied. This litigation resulted, in which the municipality raises a number of arguments in support of its denial of the requested connections.[3]
The first argument raised by Englishtown is a procedural one. It asserts that plaintiffs are seeking relief pursuant to R. 4:52-1, i.e. an interlocutory injunction, to achieve final relief in the form of permanent sewer and water connections, all without benefit of a required fact-finding hearing.
In fact, plaintiffs are seeking a mandatory injunction pursuant to R. 4:67.[4]R. 4:52 is, indeed, designed to provide for interim relief in an injunction action. However, under R. 4:67-1(b), there can be no doubt that plaintiffs are seeking final injunctive relief predicated upon the finding that Englishtown's obligation to facilitate the projects is required under a constitutional imperative, arguing that the matter also can be disposed of in a summary manner. While the matter has been raised under the service provisions of R. 4:52-1(a), see, however, R. 1:6-2(a) *445 which provides that "[a]n application to the court shall be ... in special cases, by order to show cause". See also R. 1:6-2(a).
The important public issue presented in the present matter, warranted proceeding by order to show cause and not by motion. See also R. 1:1-2. Moreover, even in a claimed summary proceeding, the court is still required to conduct a trial on the return date and resolve any "genuine issue as to any material fact." R. 4:67-5.
Nevertheless, Englishtown argues that under Crowe v. De Gioia, 90 N.J. 126, 447 A.2d 173 (1982), plaintiffs are not entitled to the relief of a mandatory injunction. Although Crowe dealt with the issue of a preliminary injunction, the factors for a consideration of a preliminary or final injunction are similar. CIBA-GEIGY Corp. v. Bolar Pharmaceutical Co., Inc., 747 F.2d 844 (3rd Cir.1984), cert. denied, 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 696 (1985).
Englishtown argues that plaintiffs can demonstrate no irreparable harm, and that monetary damages are their relief. It contends that this action is premature because the Council on Affordable Housing (COAH) has not yet approved The Township's fair share and housing plan, of which the plaintiffs' projects form a part, although Tracy Station already possesses a set aside requirement. Englishtown also argues that it would be an undue hardship to require it to participate in plaintiffs' undertakings, when the legal right to compel such action is unsettled.
Much of Englishtown's argument, however, may be summarized as follows:
Englishtown, should not be forced to participate in a plan in which the Plaintiffs and the Township of Manalapan decided which sites should be utilized to fulfill Manalapan's Mount Laurel requirements. There has been no showing by the Plaintiffs that the choice of these sites comports with "sound municipal planning" or that no other sites are available which would not require an encroachment upon the Borough of Englishtown ... The citizens of Englishtown should not be made to suffer from a decision in which they had no choice.
....

*446 ... [T]he Court must consider the effect allowing such a remedy at this point in time will have upon this, and other "neighboring" municipalities in the future. If these Plaintiffs are allowed to use Englishtown as a conduit, what is to prevent future developers from seeking such relief. Such a course of action unduly burdens Englishtown who has its own fair share requirements to meet and who must preserve the integrity of its infrastructure to provide for and protect the health and safety of its present and future residents.
[Englishtown's Trial Memorandum, pages 9 and 16.[5]]
As will be discussed further in this opinion, monetary damages are not the substitute for meeting a long and firmly established public policy goal of achieving safe, sanitary, decent housing for the most needy. Moreover, monetary damage claims have to be predicated upon the failure to permit the connections, which would be the claimed wrongful act. The presence of an issue as to the public interest is, moreover, an additional factor to be weighed in this case. Gruntal & Co. v. Steinberg, 843 F. Supp. 1 (D.N.J. 1994); Securities and Exchange Commission v. Northeastern Financial Corp., 268 F. Supp. 412 (D.C.N.J. 1967). What COAH will ultimately approve will not be deterred by plaintiffs' projects, and COAH is more likely to respond negatively if water and sewer service is not reasonably available. N.J.A.C. 5:92-13; N.J.S.A. 52:27D-311a(4); Allan-Deane Corp. v. Bedminster Tp., 205 N.J. Super. 87, 115, 122, 500 A.2d 49 (Law Div. 1985).
It must also be remembered that Tracy Station already possesses an approval requirement to address the housing needs of COAH's target groups, and Samaritan's sole reason for constructing such housing goes to the very heart of its existence, with or without COAH involvement. Moreover, the Samaritan property is zoned for low and moderate income housing. However, if such is truly Englishtown's concern, any relief granted can be conditioned *447 upon COAH's approval of Manalapan's fair share and housing plan.
Englishtown additionally argues that there are a number of significant health and safety issues that must be addressed before plaintiffs can be provided the desired sewer and water connections.
It argues that as to the proposed sewer connection, a capacity assurance study, together with an infiltration study, must now be undertaken to establish the present flow "baseline" to determine what the impact of plaintiffs' connection would be on the existing line capacity leading to the WMUA's treatment facility. It claims that such a study is necessary because it does not know the present flows, even with, it argues, significant development additions connecting to the sewer system since 1993. It also argues that a study is now necessary to determine Englishtown's future needs, a study which only now it argues is necessary. It does not deny, however, that plaintiffs' projects could be metered to determine flows and the need for future line improvements, that they can be required to contribute to future line improvements, and in the meanwhile, pay connection and service fees as may be required.
Englishtown also contends that as to the proposed water connection to a backup, essentially closed line, there could be a problem of improper water service mixture, since the private water company uses a mixture of water sources. It also argues that like the sewer issue, a capacity study must now be undertaken. It again does not deny that plaintiffs' projects could be metered for consumption, that plaintiffs could be required to contribute to future improvements, and, in the meanwhile, pay connection and service fees, in part to recover costs for an otherwise un-utilized water line. Nor is there any issue that the deliverable water would have to meet federal and state regulations for potability.
Plaintiffs respond to the more substantial arguments of Englishtown. Specifically, plaintiffs point out that a 1993 capacity study, *448 which included the plaintiffs' projects, was conducted as to the sewer line in issue, designated as the "La Satta" (Avenue) line. At that time, the Englishtown Borough Engineer, in reviewing this report, concluded:
[O]ur review and analysis indicated that the sanitary sewer in question will perform at the adequate conveyance capacity (ACC). Actually, our figures are 1% over the ACC.
... The PIQ (sewer pipe in question) is more than adequate for the build-out of Englishtown. The proposed connections of New Beginnings and Tracy Station Woods are outside the Borough and will "eat-up" most of the reserve capacity of the sewer. However, the Borough should benefit from the collection of hook-up fees and a portion of the quarterly sewer charges ...
[Letter of Borough Engineer, dated May 24, 1993.[6]]
Plaintiffs do not substantially dispute the advisability of an infiltration or similar test and their commitment for making any necessary capacity improvement of the sewer line in question. They also point out that Englishtown already services an industrial and residential site in the Township for water needs, and has done so since, at least, 1981. It should also be noted that such extra-territorial servicing is not subject to Board of Utility Regulators' rate regulations. N.J.S.A. 40A:31-23(d). Moreover, Gordons's Corner has stated there is no moratorium on the provision of water service to plaintiffs' projects, in that "[a] commitment for water service was given to these projects in 1993," affirmed by the Township. Second Certification of John J. Ploskonka, dated June 20, 1996, Exhibits A and C.
Plaintiffs also point out that "blended water", i.e. well water and surface water, are common throughout this county and any chemical imbalance problems are resolved in accordance with required environmental standards, and that pressure studies can be required *449 for determination of adequacy of the water line (La Satta) during peak periods of need. Certification of David R. Monie, dated June 19, 1996, Paragraphs 4, 7 and 11.
Finally, the Township's planner has advised the court that even if plaintiffs' projects were not finally approved in the COAH compliance process for low and moderate income housing, "since the mid 1980's ... [t]hese parcels have been planned specifically and exclusively for that purpose. They can be developed for that purpose and if restrictions are adequately structured they will qualify as Mt. Laurel housing even without C.O.A.H.'S approval." Certification of Richard S. Cramer, Jr., dated June 20, 1996, Paragraph 7.
The court has further carefully evaluated the parties' submissions and the testimony of the witnesses presented at the hearing, in line with the parties' submissions, and has reached the conclusions it believes are warranted under the circumstances.
However, even if Englishtown's objections to the desired connections are, substantively, unfounded, the issue remains as to whether it has any obligation to facilitate or assist these Mount Laurel projects in the neighboring Township.
One need only spend a short time in the Landlord/Tenant Section of the Law Division's Special Civil Part to appreciate the critical housing problems that many residents of limited means in this county experience. Each week the court has before it hundreds of tenants facing eviction, and for many, possible homelessness, because alternative housing is simply non-existent, available resources being stretched to the limit. Not every case simply involves persons who arbitrarily choose not to pay rent. Many of these soon-to-be homeless are families, whose only crime is that they are poor, and simply cannot afford to subsist, pay rent and meet other pressing family expenses. Affordable housing, coupled with the responsibility of home ownership, is an almost impossible dream for so many.
*450 Public housing is limited. Government financial commitment on all levels to its citizenry's housing needs competes with an evergrowing taxpayer distrust and perceived resistance to any further assumed costly initiatives to address what is truly a national problem. Moreover, indiscriminate tax cutting has, for many, become the only litmus test for judging effective political leadership. Such an attitude has often fueled a bidding war. Furthermore, the private sector, overwhelmed to meet this no longer unique housing need without a public/private partnership, is being ever abandoned in attempting to resolve this problem to those whose idea of a market rental has little to do with safe, sanitary or decent housing, never mind affordable housing.
There has been a long history in this state of decent housing for all being recognized as a matter of important public policy. Through various legislative enactments, the popular will and concern have been expressed over the last sixty years.
Sometimes, the measures to further the state's housing policies have been indirect, e.g. L. 1933, c. 78 (Public Housing Law); L. 1942, c. 112 (repair or demolition of unsafe or damaged buildings by municipalities); L. 1944, c. 169 (Redevelopment Companies Law); L. 1946, c. 52 (Urban Redevelopment Law); L. 1949, c. 184 (Limited-Dividend Nonprofit Housing Corporations or Associations Law); L. 1949, c. 303 (The State Housing Law of 1949); L. 1961, c. 40 (Urban Renewal Corporation and Association Law of 1961); L. 1962, c. 66 (regulation of maintenance of buildings and structures); L. 1965, c. 95 (Urban Renewal Nonprofit Corporation Law of 1965); L. 1967, c. 76 (Hotel and Multiple Dwelling Law); L. 1978, c. 122 (Moderate Income Housing); L. 1979, c. 476 (reinspection of residential rental property prior to new occupancy); L. 1979, c. 496 (Rooming and Boarding House Act of 1979); L. 1983, c. 335 (Rehabilitated and Converted Housing); L. 1983, c. 530 (New Jersey Housing and Mortgage Finance Agency Law of 1983); Ld. 1985, c. 48 (Emergency Shelters for the Homeless); L. 1985, c. 227 (New Jersey Urban Development Corporation Act); L. 1991, c. 431 (Long Term Tax Exemption Law); L. 1991, c. 441 *451 (Five-Year Exemption and Abatement Law); L. 1992, c. 89 (Unfit Buildings).[7]
Often the legislative response has been more direct, e.g. L. 1933, c. 444 (State Housing Authorities Law); L. 1938, c. 19 (Local Housing Authorities Law); L. 1938, c. 20 (Housing and Redevelopment Co-operation Law); L. 1941, c. 213 (National Defense Housing Projects); L. 1946, c. 79 (Municipal Housing); L. 1946 Second Sp. Sess., c. 323 (Veterans Housing); L. 1949, c. 187 (blighted areas); L. 1949 c. 306 (Redevelopment Agencies Law); L. 1965, c. 92 (Senior Citizens Nonprofit Rental Housing Tax Law); L. 1992, c. 79 (Local Redevelopment and Housing Law).
A review of each of these enactments evidences a clear statement of public concern and commitment that every citizen of this state be assured, as a minimum, safe, sanitary and decent housing. However, sadly, the reality has too often fallen short of the goal, despite the best of intentions. This was acknowledged, for example, in the legislative findings at the time of adoption of The Affordable Housing Act of 1983, enacted some eight years after the Supreme Court decided Southern Burlington Cty. N.A.A.C.P. v. Township of Mt. Laurel, 67 N.J. 151, 336 A.2d 713, app. dism. and cert. denied, 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975) (Mount Laurel I), wherein the court determined that "developing municipalities" were required under State constitutional mandate to satisfy the housing needs of low and moderate income people in their region:

*452 The housing needs of many New Jersey citizens remain unmet each year, exemplified by the fact that, in recent years, only one-half of the estimated annual need for new housing units has been actually constructed.
The costs of conventional housing construction, mortgages, land and utilities have increased tremendously in recent years making it increasingly difficult for certain segments of the population . .. to afford suitable conventional housing.
[N.J.S.A. 40:55D-101a and b.]
Part of that need not being met includes that for low and moderate income persons.
It was with this legislative history, yet unfulfilled expectations, that the Supreme Court decided Mount Laurel II. Rather than evidencing unbridled judicial activism, it signaled that a strained concept of judicial restraint could not be an excuse for not seeking to bring the clear and long defined public policy as to this state's commitment to housing for the most needy closer to reality, now as a constitutional imperative.
The significance of Mount Laurel II to the instant matter is very important. In Mt. Laurel I, the Court established its "developing municipality" remedial doctrine, in part because "under present New Jersey legislation, zoning must be on an individual basis, rather than regionally." Mount Laurel I, at 189, 336 A.2d 713. Yet it also signaled that "every municipality ... must bear its fair share of the regional housing burden." Id.
What changed between Mount Laurel I and II was the enactment of the Municipal Land Use Law. (MLUL), L. 1975, c. 291, effective August 1, 1976, N.J.S.A. 40:55D-1 through 136. In Oakwood at Madison, Inc. v. Township of Madison, 72 N.J. 481, 371 A.2d 1192 (1977), the Court found further support of a legislative nature for a regional concept in meeting this important housing need, espoused in Mt. Laurel I, in a number of provisions of the purposes section of the MLUL:
d. To ensure that the development of individual municipalities does not conflict with the development and general welfare of neighboring municipalities, the county and the State as a whole;
e. To promote the establishment of appropriate population densities and concentrations that will contribute to the well being of persons, neighborhoods, communities and regions and preservation of the environment;

*453 g. To provide sufficient space in appropriate locations for a variety of agricultural, residential, recreational, commercial and industrial uses and open spaces, both public and private, according to their respective environmental requirements in order to meet the needs of all New Jersey citizens.
[N.J.S.A. 40:55D-2.]
In Mount Laurel II, the Court went beyond redressing a constitutional injury to address the achievement of the constitutional goal. Id. at 237, 456 A.2d 390. It no longer is simply the obligation of only developing municipalities in the region to address the housing needs of low and moderate income people. Yet, in doing this, the Court reached its conclusions, in part, in the context of the regional planning and development purposes defined under the MLUL. Id. at 229, 456 A.2d 390. Thus, its decision was grounded upon a clear legislative goal, one in a long series, to achieve decent housing for the most needy.
This is hardly evidence of arbitrary judicial fiat. The Court was only the catalyst, in hopefully, at long last, achieving this goal, and the "builder's remedy" provided for in Mount Laurel II, was to be the practical tool to overcome the limited results of the past. Yet, the Court also recognized the eventual appropriate legislative response, and redefined its role accordingly, in upholding the Fair Housing Act (1985), N.J.S.A. 52:27D-301 through 329, under which COAH primarily oversees the meeting of this housing need. Hills Dev. Co. v. Bernards Tp., 103 N.J. 1, 25, 510 A.2d 621 (1986).
"[I]t is a virtual truism of the modern land-use canon that zoning ordinances must be regionally oriented in their provisions, prohibitions and concerns.... The insularity and parochialism of the Chinese wall theory of municipal zoning has long since been discredited...." Urban Farms, Inc. v. Franklin Lakes, 179 N.J. Super. 203, 213, 431 A.2d 163 (App.Div. 1981). See also Baptist Home of South Jersey v. Borough of Riverton, 201 N.J. Super. 226, 248, 492 A.2d 1100 (Law Div. 1984).
Courts have also long recognized that the provision of public housing and public interest housing advance the purposes of zoning and inherently promote the public good, entitling them, where needed, to use variances. DeSimone v. Greater Englewood *454 Housing Corp. No. 1, 56 N.J. 428, 267 A.2d 31 (1970); Borough of Roselle Pk. v. Township of Union, 113 N.J. Super. 87, 272 A.2d 762 (Law Div. 1970); Riese-St. Gerard Hous. Corp. v. City of Paterson, 249 N.J. Super. 205, 592 A.2d 270 (App.Div. 1991). Moreover, it is now beyond dispute that the provision of affordable housing for low and moderate income persons is essential to promoting the general welfare required in all municipal land use regulations. Holmdel Builders Assoc. v. Township of Holmdel, 121 N.J. 550, 567, 583 A.2d 277 (1990). Furthermore, re-zoning of property for Mount Laurel purposes does not constitute a "taking" as to adjacent properties. Hills Development Co. v. Bernards Tp., 229 N.J. Super. 318, 334-335, 551 A.2d 547 (App.Div. 1988).
Thus, following Mount Laurel I, as the court in Borough of Allendale v. Township Committee of Mahwah, 169 N.J. Super. 34, 404 A.2d 50 (Law Div. 1979), aff'd 177 N.J. Super. 230, 426 A.2d 73 (App.Div. 1981), concluded:
[T]he new Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq., mandates a regional approach to [housing] problems.
If a developing municipality must "bite the bullet" and re-zone for least-cost housing, its fully developed neighbors must endure the inconvenience of potential increased traffic and decreased property values....
[Id. at 37-38, 404 A.2d 50.]
More recently, in Dynasty Bldg. Corp. v. Upper Saddle River, 267 N.J. Super. 611, 632 A.2d 544 (App.Div. 1993), the Appellate Division held that an order requiring an adjoining municipality to make existing sewer capacity available for its neighboring municipality's Mount Laurel project resulted from the regional obligation to provide for such housing. Id. at 616, 632 A.2d 544. While there was a pre-existing inter-municipal agreement for sewer services between the municipalities, not present in the instant matter, nevertheless, the Appellate Division concluded that "an order requiring Ramsey to make existing sewer capacity available to Mt. Laurel inclusionary development sites (in the neighboring municipality of Upper Saddle River) comports with the concept that municipal obligations to provide for low and moderate income housing are established on the basis of regional *455 responsibility," citing Mount Laurel I and II. Id. Moreover, unlike the situation in Dynasty Bldg., Englishtown in this case, as an "affected party, has had an adequate opportunity to meet the proofs that inform the trial court's decision." Id. at 616, 632 A.2d 544.
The time has come to recognize, however, that even in the absence of a pre-existing co-operation or inter-municipal agreement, each municipality, whether developing or developed, has an obligation to facilitate, if not assist, the regional goal of providing realistic housing opportunities for low and moderate income people in a cost effective manner. Everyone is a part of the region's housing solution for its most needy. That is clear in the history of the earlier cited legislative enactments, culminating in the MLUL, as confirmed by the Supreme Court in Mount Laurel II. That regional obligation is apparent, even if the municipality does not formally adopt zoning policies to impede such housing development in the neighboring municipality.
This opinion does not attempt to establish the outer limits of that responsibility. That is not necessary for this matter. Suffice to say, however, that as a minimum, in this case, Englishtown has shown no credible reason for outright denying plaintiffs access to water and sewer service by connection to proximate and cost effective Englishtown lines in order to practically enhance a most important public policy concern. There is no obvious practical detriment, disadvantage or burden to Englishtown weighed against its obligation to facilitate and assist the housing need of the most needy in the region of which it is a necessary part.[8]
*456 In the final analysis, the determination as to whether injunctive relief should be granted in this case requires consideration of a more comprehensive list of factors than Englishtown would suggest. Moreover, as to the factors that are actually present, "the judicial process is to weigh and balance each factor in a qualitative *457 rather than quantitative manner." Crane v. Essex Fells, 67 N.J. Super. 83, 91, 169 A.2d 845 (Ch. Div. 1961), aff'd 36 N.J. 544, 178 A.2d 196 (1962).[9]
In Sheppard v. Township of Frankford, 261 N.J. Super. 5, 617 A.2d 666 (App.Div. 1992), the Appellate Division concluded that injunctive relief was warranted to prevent the continuation of a nuisance on the plaintiff's property by a municipal discharge of storm water runoff, balancing the relative hardship, in the absence of any overriding public interest. In reaching its conclusion, the court cited the relevant, but not exclusive, factors as set forth in Restatement (Second) of Torts Section 936 (1977):
(1) The appropriateness of the remedy against a tort depends upon a comparative appraisal of all of the factors in the case, including the following primary factors:
(a) the nature of the interest to be protected,
(b) the relative adequacy to the plaintiff of injunction and of other remedies,
(c) any unreasonable delay by the plaintiff in bringing suit,
(d) any related misconduct on the part of the plaintiff,
(e) the relative hardship likely to result to defendant if an injunction is granted and to plaintiff if it is denied,
(f) the interests of third persons and of the public, and
(g) the practicability of framing and enforcing the order of judgment.[10]
*458 In this action, the nature of the interest which the plaintiffs seek to protect is closely related to the constitutionally mandated goal of their undertaking, i.e., low and moderate income housing. Moreover, in attempting to meet this constitutionally mandated goal, the issuance of a permanent and mandatory injunction is a more adequate, immediate, practical and appropriate remedy than any possible, if not speculative, monetary relief. It is not the presence of one remedy to the exclusion of the other, but rather the most suitable under the circumstances.
Furthermore, it is difficult to imagine that Englishtown, given its admitted, timeless, though disputed, position that it would not assist such needs beyond its geographical borders, would react differently if this action had been brought earlier. Were plaintiffs any more dilatory than the municipality, which argues it now needs belated water and sewer system studies to determine their present status in not only meeting plaintiffs' needs, but also those of Englishtown's future development? The possible earlier achieving of alternative connections, requiring negotiated and not involuntary easements, is an interesting point, but does not now outweigh the obvious public interest in achieving the necessary housing goal, in the absence of overriding hardship to Englishtown.
In considering the relative hardship, the "balancing of equities" favor the plaintiffs. As to sewer service, plaintiffs will have to pay required connection and service charges to public authorities. Flows can be monitored to determine the need for future improvements. The concern as to present capacity, not questioned in these proceedings by the treating authority, the WMUA, will, however, be discussed further in this opinion.
As to water service, the line connection is relatively unused, and, again, plaintiffs will have to pay required connection and *459 service charges to public authorities. The objective here is to draw water from the private water company, Gordons Corner. However, assuming there is a water mix as to sources, in this day when there are limits on subsurface divergence, and all sources of water are treated, actual differences beyond perception are increasingly irrelevant. Proper engineering cannot only assure the monitoring of the line through metering as to flows, but assure no quality unbalancing for a perceived unique water source. Yet, in an emergency, it is difficult to believe that the desire by Englishtown to maintain a claimed pristine water source would take precedence over not using the multi-source private water company's available water, when the choice is no water for essential human needs or potentially unbalanced water, even requiring additional treatment. Englishtown has already faced this situation and used Gordons Corner's "mixed" water. Moreover, there is no issue as to Englishtown's diversion rights, with any necessary recharging being provided by the private water company as required.
In the final analysis, concerns as to both sewer and water line treatment/service capacities, except as will be discussed further, and the proposed connections, themselves, will be irrelevant if the WMUA and Gordons Corner conclude they do not have the treatment/service capacities and refuse to provide the requested services. Moreover, COAH's ultimate conclusion on the compliance request of Manalapan will not be significant as to one plaintiff, which already possesses an affordability requirement and the other plaintiff, which exists to provide low and moderate income housing.
In any event, the relative hardships, as to the realistic concerns the parties may have, can be addressed in a carefully drafted order which would include the imposition of appropriate conditions.
Nevertheless, the court must conclude that, the most predominate factor under a qualitative analysis, is the public interest in developing housing for low and moderate income needs for the *460 reasons already stated. Englishtown has argued that it also has a public interest concern, even if it is more limited or parochial. That cannot be denied, beyond simply any desire to assert the "Chinese wall theory" in the face of now required regional planning for regional needs. Urban Farms, Inc., supra, 179 N.J. Super., at 213, 431 A.2d 163. Englishtown, moreover, cannot deny it is part of that region, where housing problems are not "their" concern, but rather "our" concern. For their part, plaintiffs are seeking the ancillary support needed to make a constitutional mandate a reality.
There are different qualitative public interests to be addressed in this action. Beyond potential cost savings, the present imperative to meet necessary housing needs, timely, is obvious. At the same time, the public health, safety and welfare is not served if the present sewer and water lines for which connections are desired are overburdened, which the court finds a most credible concern of Englishtown.
The decision in Crane suggests the practical solution in resolving these different, if not competing, "public interests." Id. at 94, 169 A.2d 845. Each must and can be addressed, in the court's view.
Therefore, the court will enter an order requiring the requested sewer and water connections subject to the following conditions:
1. Within fourteen days of this decision, the parties shall notify the court that they have agreed to the selection of an engineering service to conduct a feasibility study as to the ability of the present Englishtown sewer and water line connections in question to accept, in terms of capacities and sewerage flows, those amounts estimated to be generated by plaintiffs' projects and also provide for the water needs of plaintiffs' projects. This study shall update the 1993 study as to sewer flow and include an infiltration (sewer) and pressure and compatibility (water) evaluation of the sewer and water lines in question, denoted as the La Satta lines, with conclusions and recommendations as to these *461 matters, including any cost allocations for improvements and quality control of the systems.
2. If the parties cannot agree as to the selection of an engineering service, they shall notify the court of their impasse in the same fourteen-day period. In that event, the court will appoint an engineering service within an additional fourteen day period for the purpose of conducting the combined sewer/water study.
3. The engineering service shall commence its work within thirty days of its appointment by the parties or the court, and complete its study within ninety days thereafter.
4. The cost of the engineering study services shall be borne equally by the parties. The engineering service shall be paid in full within forty-five days of the submission of its claim for payment. The engineering service may enforce its request for payment before this court.
5. The parties and their officers, agents, employees and professional staff shall fully cooperate in this study and make available to the engineering service appointed all documents, maps, reports and access required by the engineering service, as determined solely by it. The engineering service may enforce its requests before this court.
6. The decisions of the engineering service appointed as to the study shall be conclusive and final.
7. If the study concludes that there are present sewer and water line capacities to accommodate plaintiffs' projects, then Englishtown shall permit such connections at least thirty days after the engineering service's final report is issued, subject to the following further conditions:
A. Plaintiffs have entered into final, written agreement with the WMUA, the Township and Gordons Corner for the desired sewer and water services, respectively, subject only to the satisfactory completion of the above study recommending the requested connections.
*462 B. The connections shall be made, and all connection and service fees and charges paid by the plaintiffs as required under all applicable laws and regulations.
C. Following the recommendations of the engineering service appointed, plaintiffs, at their own costs, shall complete the water connection in such a way as to provide for quality control and to permit monitoring of sewerage flows and water consumption.
D. COAH has approved the Township's fair sharing plan with the housing element containing plaintiffs' projects.
8. If the study concludes that there are not present sewer and water line capacities to accommodate plaintiffs' projects, then this order may be vacated. However, the parties will be free to negotiate thereafter such improvements and their costs to accommodate plaintiffs' needs. Nothing herein shall prevent plaintiffs from agreeing to make any improvements recommended by the engineering service to assure sewer and/or water capacities and quality controls under this order.
9. The court shall retain jurisdiction in this matter.
Counsel for plaintiffs shall prepare and submit a proposed order pursuant to R. 4:42-1c, embodying the conclusions reached in this decision.
NOTES
[1] "Facilitate" and "assist," words chosen by the court to consider the nature of the obligation, if any, are not necessarily synonymous. Webster's New Ideal Dictionary defines "facilitate" as "to make easier," and "assist" to mean "to give support, and aid or help." The difference may be between the degree of positive or passive involvement.
[2] Englishtown has its own wells and water distribution system for normal water usage for its customers. It is not proposed, beyond the "conduit connection," that the projects in question will purchase any water from Englishtown or utilize any of its facilities for water service, although there will be a mix of water sources. The line to which the plaintiffs wish to connect serves as an emergency back-up connection to Gordons Corner, as circumstances might require. It is, otherwise, un-utilized. Gordons Corner uses a combination of well and surface water to service its customers. The connection has been used by Englishtown for periods up to six weeks as needed.
[3] No affirmative claims are made in this litigation against the remaining defendants. Although Englishtown questions the suitability of the zoning to permit plaintiffs to construct low and moderate income housing, no challenge to the Township's zoning is raised by a cross-claim or any defense to the within complaint, whether or not timely, nor was any testimony presented at trial as to this issue.
[4] Unlike a prohibitory injunction, a mandatory injunction commands the defendant to do some positive act or particular thing, prohibits him from refusing (or persisting in a refusal) to do or permit some act to which plaintiff has a legal right, or restrains defendant from permitting his previously wrongful act to continue. Bailey v. Schnitzius, 45 N.J. Eq. 178, 16 A. 680 (E. & A. 1989). In a prerogative writ action, it would be the seeking of a mandamus. Moreover, in a prerogative writ action, injunctive relief may also be sought. Dolan v. De Capua, 16 N.J. 599, 613-614, 109 A.2d 615 (1954). In effect, plaintiffs seek to invoke the court's equitable powers to restrain what they regard as a constitutional tort, the nature of which will be discussed further in this opinion.
[5] A similar sentiment was expressed by Englishtown's Consultant Engineer: "It should be noted, that the Council of Englishtown has in the past repeatedly refused to approve sewer and/or water connections for developments outside the Borough. Based upon my experiences with Englishtown, the Council's present course of action is consistent with its past actions." Certification of John Van Dorpe, dated June 13, 1996, paragraph 8.
[6] The Borough Engineer included a number of caveats in his letter, concerned with possible further development in Englishtown and the need for an actual inflow and infiltration (I/I) study. However, he concluded, "[w]e believe that the results [of actual monitored flows] will conclude that there is adequate capacity and the Borough will have that added assurance." Englishtown apparently never authorized the engineer's recommended flow tests, even paid from an existing escrow account.
[7] Moreover, the Supreme Court has recognized the right of a municipality to enact a rent stabilization ordinance pursuant to the police power statute, N.J.S.A. 40:48-2, for, among other reasons, to deal with a housing shortage and housing burdened with habitability violations. Hutton Park Gardens v. Town Council of Town of West Orange, 68 N.J. 543, 350 A.2d 1 (1975); Brunetti v. Borough of New Milford, 68 N.J. 576, 350 A.2d 19 (1975); Troy Hills Village v. Township Council of Parsippany-Troy Hills Tp., 68 N.J. 604, 350 A.2d 34 (1975). It may also be argued that the State Uniform Construction Code Act, N.J.S.A. 52:27D-119 through 141, and the regulations promulgated thereunder, are also designed to achieve, among other goals, safe, sanitary, and decent housing.
[8] While the focus of the Mount Laurel doctrine is to provide housing free of economic discrimination, and not to achieve economic or racial balance, East/West Venture v. Fort Lee, 286 N.J. Super. 311, 336, 669 A.2d 260 (App.Div. 1996), query whether, for example, N.J.S.A. 40:55D-2d ("to ensure that the development of individual municipalities does not conflict with the development and general welfare of neighboring municipalities ...") requires local land use regulations, to assist and not just avoid hindering a neighboring Mount Laurel project, or face a successful legal challenge. For example, should a municipality be able to re-zone property contiguous to a neighboring Mount Laurel project as industrial to arguably frustrate the residential scheme of the area, even if the industrial use has some even limited validity? The answer may be obvious in the face of such a blatant attempt to frustrate the project. More significantly, can that neighboring municipality be required to make its own drainage and roadway improvements, in the absence of which, the contiguous or nearby Mount Laurel project would be doomed? The answers to these and similar questions may be provided another day. However, see Ferraro v. Zoning Bd. of Adjustment, 119 N.J. 61, 73, 574 A.2d 38 (1990); Quinton v. Edison Park Development Corp., 59 N.J., 571, 578, 285 A.2d 5 (1971); and Cresskill v. Dumont, 15 N.J. 238, 245-249, 104 A.2d 441 (1954).

In Ferraro, property that stradled two municipalities had to be reconciled for development for a business use, when one municipality zoned its part for business use and the other for residential, and where a use variance was requested for a proposed business use. The Court held that regional "considerations take on added significance in this case because the proposed use is permitted in the adjoining municipality. The fact that [one] allows the use may suggest that the property in [the other] is uniquely suited for the proposed use." Id. at 73, 574 A.2d 38.
In Quinton, the Court concluded that consideration in developing a business use of property, zoned for business uses in one municipality, still required attention to the adjoining municipality's contiguous residential district. In Cresskill, the Court determined that a municipality, bordering several other municipalities, all of whose zoning in the area was for residential uses, was required to give fair consideration to these other municipalities' residential concerns before amending its zoning ordinance to change a residential use to a business use. Cresskill, supra, 15 N.J. 238, 104 A.2d 441 (citing Duffcon Concrete Products, Inc. v. Borough of Cresskill, 1 N.J. 509, 513, 64 A.2d 347 (1949)). "What may be the most appropriate use of any particular property depends not only on all the conditions, physical, economic and social, prevailing within the municipality and its needs, present and reasonably prospective, but also on the nature of the entire region in which the municipality is located and the use to which the land in that region has been or may be put most advantageously. The effective development of a region should not and cannot be made to depend upon the adventitious location of municipal boundaries...." Duffcon Concrete Products, Inc., supra, 1 N.J. at 513, 64 A.2d 347 (emphasis added) This is early recognition, even some nearly fifty years ago, of the need for a regional concept for development.
[9] Interestingly, in Crane the issue concerned the right of a property owner to restrain a municipality's testing of a water well that provided water on a regional basis. In seeking to balance the inter-municipal needs against the plaintiff's property rights, the court noted the significance of the public interest factor in determining the appropriateness of the injunctive remedy. The court cited Hurley v. Kincaid, 285 U.S. 95, 104, 52 S.Ct. 267, 269, 76 L.Ed. 637 (1932), wherein Justice Brandeis stated: "where large public interests are concerned and the issuance of an injunction may seriously embarrass the accomplishment of important governmental ends, a court of equity acts with caution and only upon clear showing that its intervention is necessary in order to prevent an irreparable harm." Here, the plaintiffs argue that irreparable harm will result if the accomplishment of an important public goal, i.e., the provision of constitutionally mandated housing for the most needy, is frustrated, requiring the granting of a mandatory injunction to further this public interest.
[10] The same balancing required in considering whether a prohibitory injunction should issue is used when considering the issuance of a mandatory injunction. Tustin v. Heckler, 591 F. Supp. 1049 (D.N.J. 1984), order vacated in part, 749 F.2d 1055. Section 936(2) addresses the issue of an "interlocutory injunction," applying some of the factors in Crowe v. De Gioia, 90 N.J. 126, 447 A.2d 173 (1982).